Filed 8/22/24

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080471 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD275109) |
| JEFF SHEI HOLLIDAY, | |
| Defendant and Appellant. | |
| THE PEOPLE, | D080740 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD275109) |
| JOSE OSCAR ESQUEDA, JR., | |
| Defendant and Appellant. | |

---

\*     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.A.1, III.A.2, and III.B.

CONSOLIDATED APPEALS from judgments of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge. Affirmed in part, reversed in part, and remanded.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant Jeff Shai Holliday.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Jose Oscar Esqueda, Jr.

Bob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendants Jeff Shai Holliday and Jose Oscar Esqueda, Jr. were jointly tried before separate juries on charges related to three separate assaultive incidents that occurred in 2017. For the first two incidents, the men were charged with accosting strangers in Pacific Beach and Chula Vista, respectively, and taking or attempting to take the victims' property. In the third incident, which occurred approximately seven months after the second, the defendants approached an inebriated man in the Gaslamp Quarter of San Diego. According to the prosecution evidence, a fight ensued when Holliday punched the man, and the man's friends came to his aid. During the resulting brawl, Esqueda used a knife in his possession to stab two men, one of whom died at the scene.

The defendants' juries found them guilty of two counts of conspiracy to commit robbery and one count of robbery in connection with the Pacific Beach and Chula Vista incidents. Esqueda's jury found him guilty of premeditated

murder, attempted murder, and assault by force likely to produce great bodily injury in connection with the Gaslamp Quarter melee. As to that incident, Holliday's jury convicted him of the lesser offense of involuntary manslaughter in connection with the death, as well as with assault by force likely to produce great bodily injury in connection with his punching of another victim.

Defendants raise multiple issues on appeal. In the published portion of this opinion, we conclude that the trial court erred by giving a modified version of CALCRIM No. 375, which used a preponderance of the evidence standard for the jury's consideration of evidence of the charged Pacific Beach and Chula Vista crimes. This instruction effectively lowered the prosecution's burden of proving those crimes beyond a reasonable doubt, resulting in a violation of the due process clause of the Fourteenth Amendment. Such a structural error is reversible per se. We therefore reverse both defendants' convictions for the Pacific Beach and Chula Vista crimes (counts 5–7) and remand for further proceedings. In all other respects, we find no prejudicial error and affirm the remaining convictions.[1]

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual Background*

1.      *The Pacific Beach Offenses (Counts 5 & 6)*

On April 15, 2017, at about 6:30 p.m., Adam E. and his fiancée were riding bikes on the sidewalk in the Pacific Beach area of San Diego, heading

---

[1]      On our own motion, we consolidate the defendants' appeals, case Nos. D080471 and D080740, for purposes of decision. Our consolidation renders moot Holliday's request that this court take judicial notice of the appellate record in Esqueda's appeal, case No. D080471.

3

toward the beach. Esqueda and Holliday were walking in the opposite direction. As the two parties encountered each other, Esqueda jumped in front of Adam and punched him in the head using a partially closed fist. The hit knocked Adam off of his bike.

As Adam tried to get back to his feet, Esqueda came toward him, looking like he wanted to fight. Adam was afraid because Esqueda appeared to want to hurt or kill him. Adam initially retreated, but Esqueda kept approaching. Adam then stood his ground and began moving toward Esqueda. At that point, Esqueda fled from the scene, and Adam pursued him.

Meanwhile, just after Adam fell from his bike, Holliday grabbed it and rode off. Holliday paused nearby, next to a parked Chrysler sedan, to wait for Esqueda. However, according to Adam's trial testimony, when Holliday saw that Adam was chasing Esqueda, he exclaimed, "Oh shit," and threw the bike down. Holliday yelled to Esqueda, "[C]ome on, come on, come on." Holliday and Esqueda jumped into the Chrysler and sped away. Adam managed to photograph the car and its license plate. Police were able to determine that the car was registered to Holliday.

2.      *The Chula Vista Offense (Count 7)*

On April 29, 2017, two weeks after the incident in Pacific Beach, Esqueda and Holliday went to the Chula Vista Mall in the same Chrysler. At around 9:00 p.m., when the mall was closing, a man carrying a shopping bag from a Vans store was walking through the parking lot. Esqueda and Holliday approached the man. One of them advanced from the front, while the other approached from the back. After a brief interaction, Esqueda and Holliday tried to physically take the bag from the man. According to witness testimony, the man resisted and yelled, "[S]top[!]" He pulled himself free

4

from Esqueda and Holliday and ran to some women who were heading to their car. At that point, Esqueda and Holliday walked off empty-handed, heading toward Sears. Video from a mall surveillance camera captured the incident.

A witness who worked at a store in the mall was watching what occurred and called 911. The employee testified that a little bit after she watched the man run away from Esqueda and Holliday, she heard a woman yell, "Help." She turned in the direction of the Sears and saw a woman running.

At around this same time, a janitor at the mall received a report from a woman that someone was being "mugged or robbed" near the Sears. The woman described the assailants as wearing the same clothing that Esqueda and Holliday had been seen wearing on the surveillance video.

Within minutes a police officer responded to the scene. He noticed that Esqueda and Holliday matched the description shared by the dispatcher and detained them. The men denied having tried to rob anyone. The mall employee who had witnessed Esqueda and Holliday engage with the man with the Vans bag declined to return to the mall to participate in a field identification.[2] Officers found no weapons on Esqueda or Holliday, but they did not search the Chrysler. Because the men had no weapons on them when searched and because the employee who saw them declined to do a field identification, officers let the pair go.

3.    *The Gaslamp Quarter Offenses (Counts 1–3)*

Several months later in the early morning hours of December 29, 2017, Holliday and Esqueda were out together in the Gaslamp Quarter of

---

[2]    At trial the witness conceded that she declined to return to the mall because she was "afraid of getting involved."

San Diego.  Surveillance videos from the area show the two at various locations that early morning.  Esqueda was wearing gloves and had brought along a folding Karambit-style knife.  Esqueda's knife had a three-inch curved blade and a five-inch handle.

At 1:24 a.m., a man holding an unlit cigarette walked up to Esqueda and appeared to ask him for a light.  Esqueda responded by holding the knife up to the man's face.

Just after this, Esqueda and Holliday crossed the street and then doubled back to where the man with the cigarette had gone.  Video shows the pair first noticing the man with the cigarette getting a light from another individual, and then heading toward those men.  Esqueda and Holliday paused nearby but did not appear to interact with anyone.  Eventually they moved along.

Less than a block away, a group of five men (Ryan H., Christopher D. (also referred to as Chris), Andrew H., Brandon O., and Curtis S.) were looking for their car after a night out in the Gaslamp Quarter.  The men had left a bar after Chris had an altercation with another patron that resulted in Chris being punched and having a bloody nose.

Chris was inebriated, on his phone, and lagging behind his friends.  He ended up alone on one side of the street while his friends stood waiting for him across the street.  Esqueda and Holliday were on the same side of the street as Chris, and they walked toward him.  Holliday hung back a bit, but Esqueda brushed past Chris and glared at him.  Chris responded by trading words with Esqueda.  What Chris said to Esqueda is unclear.  Chris provided multiple versions of what he might have said, including that he may have said "[f]uck you" and "called [Esqueda] a pussy."  Chris also "guess[ed]" that he said "[w]here you from" to Esqueda, acknowledging the possibility because

6

he, Chris, "was [being] a drunk asshole."[3]  The phrase "where you from" can be considered to be a gang challenge, but there was no evidence that Chris or Esqueda were members of a gang.

As Chris and Esqueda were exchanging words, Holliday stepped up from behind Chris and punched him on the right side of his head.  Chris stumbled from the hit, and Esqueda and Holliday closed in on him.

Chris's friends ran across the street to defend him.  Brandon took on Holliday and swung at him.  This caused Holliday to run off, with Brandon briefly giving chase.

While that was happening, Andrew approached Esqueda and took two swings at him.  Esqueda said to Andrew, "What's up motherfucker?  You want some?" as he stabbed Andrew in the back and in the chest.  Andrew never saw Esqueda's knife.  At first, he thought Esqueda was only punching him.  It was not until he reached up under his shirt, felt something wet, and saw blood that he realized Esqueda had stabbed him.  At that point Ryan entered the fray, possibly attempting to break the two up.  Esqueda stabbed Ryan in the throat, plunging it three inches deep—the full length of the blade.

Esqueda then fled, holding the knife up toward Brandon and saying "what's up, what's up" as he left the scene.

The wound to Ryan's neck was severe and he quickly lost large amounts of blood.  He momentarily staggered and then fell on his face.  Chris and Brandon tried to help save Ryan by applying pressure to his neck wound.  Eventually a police officer and paramedic tried as well.  Ryan died at the scene as a result of blood loss caused by the stab wound to his neck.

---

[3]     At trial, Chris could not recall saying "[w]here you from" to Esqueda or telling police that he may have said it.

As Ryan was dying at the scene, Andrew ran to get assistance for his own severe wounds. He was losing a lot of blood. Once police arrived, an officer applied pressure to his wounds and tried to get information out of him. Andrew was feeling very weak and lightheaded. He could not identify the attackers or tell officers what had happened. Paramedics arrived and transported him to a hospital emergency room where he underwent surgery. Andrew was hospitalized for five days and ultimately "underwent 17 or 18 surgeries" as a result of the attack.

4.     *The Defenses*

a.     *Holliday's Defense*

Holliday did not testify at trial. His defense in connection with the Gaslamp Quarter incident was that he had punched Chris in self-defense because Chris was prone to violence and had started the fight by purportedly saying, "Where you from" to Esqueda. Holliday's attorneys also argued that his punch was not one likely to produce great bodily injury.

With respect to the incidents in Pacific Beach and Chula Vista, Holliday's defense was that the evidence presented by the prosecution was insufficient to show he had an intent to rob anyone, let alone a plan to do so, or that he committed any act of robbing someone.

b.     *Esqueda's Defense*

Like Holliday, Esqueda did not testify at trial. And, also like Holliday, Esqueda's defense in connection with the Gaslamp Quarter incident was that Chris started the fight through his confrontational words, "Fuck you, pussy. Where you from." Esqueda's defense team also portrayed Ryan and Andrew as violent aggressors, arguing that the stabbings were done in self-defense.

As to the Pacific Beach and Chula Vista charges, Esqueda's defense asserted, like Holliday's, that the evidence failed to show that he had an

8

intent or plan to rob, or that he committed the act of robbing anyone. The defense also argued that the incidents were so insignificant that law enforcement did not pursue the cases at the time they occurred.

B.    *Procedural History*

After the Gaslamp Quarter fight, the defendants were charged in a single information with one count of murder in connection with Ryan's death (Pen. Code,[4] § 187, subd. (a); count 1); one count of assault by force likely to produce great bodily injury related to the attack on Chris (§ 245, subd. (a)(4); count 3); two counts of conspiracy to commit robbery in connection with the Pacific Beach and Chula Vista incidents (§§ 182, subd. (a)(1), 211; counts 5 & 7); and one count of robbery in connection with the Pacific Beach incident (§ 211; count 6).[5]

In addition, Esqueda was charged with a single count of attempted murder in connection with Andrew's stabbing (§§ 644, 187, subd. (a); count 2).[6] The operative information also alleged that Esqueda personally used a deadly weapon with respect to counts 1 and 2 (§ 12022, subd. (b)(1)),

---

[4]    All further statutory references are to the Penal Code unless otherwise indicated.

[5]    Both men were charged with an additional count of conspiracy to commit robbery in connection with the Gaslamp Quarter incident (originally listed as count 4), as well as a robbery special circumstance allegation made in connection with Ryan's murder. However, during trial on March 15, 2022, the court dismissed the robbery special circumstance allegation and the conspiracy to commit robbery count. The amended conforming information then mistakenly included a personal use enhancement allegation under the "Count 4" heading.

[6]    Originally, Holliday was also charged with the attempted murder of Andrew, but that charge was dismissed before trial.

9

personally inflicted great bodily injury with respect to count 2 (§§ 1203.075, subd. (a) & 12022.7, subd. (a)), and had suffered two prior prison terms (§§ 667.5, subd. (b), 668).

As to Holliday, the operative information alleged that Holliday committed the offenses while on felony probation and that he had suffered a prior serious felony conviction (§ 667, subd. (a)(1)) and a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12).

Esqueda and Holliday were tried together before separate juries. Esqueda's jury convicted him as charged. The jury also found true the personal use enhancement allegations connected with counts 1 and 2, as well as the great bodily injury enhancement allegation connected with count 2. The trial court sentenced Esqueda to an indeterminate term of 25 years to life for Ryan's murder, plus an additional determinate term of 15 years, consisting of seven years for the attempted murder conviction, one year for the assault conviction, one year each for the robbery and conspiracy to commit robbery convictions, plus an additional five years for the personal use of a deadly weapon and great bodily injury enhancements connected with the murder and attempted murder convictions.

Holliday's jury convicted him as charged on counts 3, 5, 6, and 7, and found him guilty of the lesser offense of involuntary manslaughter on count 1. Holliday admitted he had suffered a prior strike conviction (§ 667, subds. (b)–(i)) and a prior serious felony conviction (*id.*, subd. (a)(1)). The trial court sentenced Holliday to a total term of 19 years in prison, consisting of eight years for the manslaughter conviction (based on an upper term of four years, doubled to eight as a result of his prior strike), two years for the assault, two years for one of the conspiracy convictions, two years for the robbery conviction, and five years for the prior serious felony conviction

10

enhancement. The court stayed imposition of sentence on the remaining conspiracy conviction pursuant to section 654.

III.

DISCUSSION

A.    *Issues Raised by Both Defendants*

    1.    *The Trial Court Did Not Err in Denying Severance*

Esqueda and Holliday contend that the trial court should have granted their motion to sever the counts related to the Gaslamp Quarter incident (counts 1–3) from the Pacific Beach and Chula Vista incidents (counts 5–7). As we shall explain, after assessing the relevant factors, we conclude the trial court did not abuse its discretion by denying their motion to sever the counts relating to the Gaslamp Quarter incident from the counts relating to the other two incidents. The evidence relating to the various charges would likely have been cross-admissible in separate trials, but even without cross-admissibility, none of the charges were unusually likely to inflame the jury against the defendants and the prosecution did not join a particularly weak case with a strong case or with another weak case. All three cases against defendants were strong. Nor was there gross prejudice amounting to a constitutional violation resulting from the joint trial.

    a.    *Additional Background*

From the beginning, starting with the original information filed in June 2018, the defendants were charged with offenses arising out of all three of the incidents. At that time, in addition to the other charges that remained in place throughout the trial, the defendants were charged with conspiracy to commit robbery, as well as a robbery special circumstance allegation related to Ryan's death, in connection with the Gaslamp Quarter incident. Before trial, the defendants moved to sever the charges arising from the three

11

different incidents from each other, or, at a minimum, to sever the Pacific Beach and Chula Vista charges from those arising out of the Gaslamp Quarter incident.

At a pretrial hearing on the motions in limine, the court denied the defendants' request to sever the charges. The court noted that section 954 expresses a legislative preference for joining charges that are of a similar nature, as the charges in this case were, and explained that only where a joint trial would result in an unfair trial is severance required. The court considered the factors at issue for purposes of a motion to sever, concluding that they did not weigh in favor of severance. The court noted that "the cross admissibility" was "one of the key factors here," because "[a]ll of this stuff, one way or another, is going to be played out in the murder trial."

During trial, the trial court dismissed the robbery special circumstance allegation, as well as the conspiracy to commit robbery charge that was alleged in count 4 regarding the Gaslamp Quarter incident. After this ruling, Holliday's counsel renewed his motion to sever the Pacific Beach and Chula Vista charges in counts 5 through 7 from the Gaslamp Quarter charges in counts 1 through 3. The court denied the renewed motion, noting that the crimes, even despite the lack of robbery allegations in connection with the Gaslamp Quarter incident, remained the same class of crimes—violent felonies—and that the legislative preference for a joint trial remained paramount.

b. *Legal Standards*

Section 954 authorizes the joinder of two or more different offenses that are "connected together in their commission" or that are "of the same class of crimes or offenses." Joinder of charges is favored because it avoids the increased expenditures of funds and judicial resources that may result from

12

separate trials. (*People v. Simon* (2016) 1 Cal.5th 98, 122 (*Simon*); *People v. Merriman* (2014) 60 Cal.4th 1, 37 (*Merriman*).) Thus, joinder " 'is the course of action preferred by the law,' " but "a trial court [nonetheless] has discretion to sever properly joined charges in the interest of justice and for good cause." (*Simon*, at p. 122.)

Review of a decision denying a motion to sever proceeds in two steps. (*Simon, supra*, 1 Cal.5th at p. 122.) In the first step, we review the order "for abuse of discretion." (*People v. Vargas* (2020) 9 Cal.5th 793, 817 (*Vargas*).) Specifically, "we examine whether, in light of the information available at the time, the trial court abused its discretion in denying the severance motion prior to the guilt phase. [Citation.] Where, as here, the statutory requirements for joinder are met, a defendant must make a 'clear showing of prejudice' to establish that the trial court abused its discretion in denying the motion. [Citation.] A defendant seeking severance of properly joined charged offenses must make a stronger showing of potential prejudice than would be necessary to exclude evidence of other crimes in a severed trial." (*Simon,* at pp. 122–123, fn. omitted.)

A reviewing court considers four factors to determine if a trial court abused its discretion in denying a severance motion. First, "we consider 'whether evidence of the crimes to be jointly tried is cross-admissible.' [Citation.] Second, we address whether the charges are especially inflammatory. Third, we consider whether a weak case has been joined to a strong one 'so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges.' [Citation.] Finally, we consider whether joinder renders the case capital when it would not otherwise have been." (*Vargas, supra,* 9 Cal.5th at p. 817.) " ' "[I]f evidence underlying the offenses in question would be 'cross-admissible' in separate trials of other

charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses.' ' " (*People v. Scott* (2011) 52 Cal. 4th 452, 470.) Importantly, "it is sufficient that evidence supporting [one crime or set of] crimes would be admissible in a separate . . . trial [on another crime or set of crimes]. As [the Supreme] [C]ourt has explained, ' "two-way" cross-admissibility is not required.' " (*Merriman, supra*, 60 Cal.4th at p. 38.)

In the second step, even if we have concluded that the denial of a severance motion was not an abuse of discretion at the time it was made, we consider whether the joint trial ultimately " 'resulted in such gross unfairness as to amount to a due process violation.' " (*People v. Landry* (2016) 2 Cal.5th 52, 77 (*Landry*); see *People v. Stitely* (2005) 35 Cal.4th 514, 531 ["A pretrial ruling that was correct when made can be reversed on appeal only if joinder was so grossly unfair as to deny due process."].)

### c.  *The Court Did Not Abuse Its Discretion in Denying the Severance Motion*

There is no dispute that the initial joinder of all of the offenses was proper, and that this remained true even after the court dismissed the robbery-related charges alleged in connection with the Gaslamp Quarter incident, given that robbery, attempted murder, and murder are all assaultive crimes against the person and, therefore, are considered the "same class" of crimes. (§ 954; *People v. Capistrano* (2014) 59 Cal.4th 830, 848 (*Capistrano*) [attempted murder and robbery are in the same class of assaultive crimes against the person], overruled on other grounds by *People v. Hardy* (2018) 5 Cal.5th 56, 104; *People v. Trujeque* (2015) 61 Cal.4th 227, 259 [same, as to robbery and murder]; *People v. Elliott* (2012) 53 Cal.4th 535, 551 [same, as to attempted murder, assault with a firearm, and robbery];

14

*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243 [robbery and murder are in same class of crimes].)

i.          *Cross-admissibility*

" ' " '[T]he first [factor to address] in assessing whether a combined trial [was] prejudicial [and thus denial of severance was an abuse of discretion] is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others.  If so, any inference of prejudice is dispelled.' " '  [Citation.]  Although cross-admissibility is not 'a precondition to joinder of charges' [citation], its existence negates prejudice." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 746–747.)

The defendants assert that evidence from the Gaslamp Quarter incident would not have been cross-admissible in a separate trial of the other two incidents and vice versa because the other crimes evidence would have been inadmissible propensity evidence and was more prejudicial than probative under Evidence Code section 352.  For example, Holliday argues that "the prior incidents were not sufficiently similar to the incident in the homicide case to be admissible to show intent, or motive, or to show a common scheme to rob people by means of distraction in a separate trial of the homicide case or vice versa."  We disagree.

"[T]here exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought:  *'The least degree of similarity . . .* is required in order to prove intent.  [Citation.] . . . In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" [Citation.]' [Citation.]  By contrast, a

15

higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity." (*People v. Soper* (2009) 45 Cal.4th 759, 776, fns. omitted (*Soper*).)

With respect to what is required to prove intent, the Supreme Court has explained that " '[T]he recurrence of a similar result . . . *tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state*, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402, italics added (*Ewoldt*).) The Supreme Court has "long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is disposed to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." (*People v. Robbins* (1988) 45 Cal.3d 867, 879, superseded by statute on other grounds as stated in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13.)

Here, the defendants did not deny committing the assaultive *acts* that occurred during the Gaslamp Quarter incident (the stabbings by Esqueda and Holliday's striking of Chris). Instead, they placed their mental state at issue by claiming that they acted in self-defense. Thus, evidence that these two defendants jointly partook in other assaultive conduct on the other dates,

16

even if such conduct was not charged as simple assaults or batteries, would at least have some "tendency in reason" (Evid. Code, § 210) to demonstrate that these same defendants were not operating innocently in self-defense, but instead possessed the same non-innocent intent to engage in assaultive conduct on each of these occasions—including during the Gaslamp Quarter incident.  (See *People v. Guerrero* (1976) 16 Cal.3d 719, 726 ["the standard framework for admission of evidence of other crimes is if there is no doubt that defendant has committed an act, but some question as to his intent in doing so"].)

Indeed, in the Pacific Beach incident, Esqueda and Holliday operated together, arriving in Holliday's Chrysler and approaching an unknown victim out in the public.  Ultimately, Esqueda used a fist to strike the victim without warning.  And at the Chula Vista mall, again, the men arrived together and operated in tandem, choosing another unknown victim to accost in public.  While the mall employee did not see either of the defendants punch the victim, she did observe one or both defendants using force to try to pry a bag from the victim's hands.  The defendants operated similarly in connection with the Gaslamp Quarter incident, at least initially.  Again, the pair arrived together, approached an unknown victim out in public, and while this time Esqueda initiated contact with the victim through the menacing behavior of brushing past and glaring, Holliday took that opportunity to strike the victim from behind without warning.  The "recurrence of a similar result"—in this case, the physical attacks on unknown victims committed by the same two perpetrators in each case—"tends (increasingly with each instance) to negative . . . self-defense or good faith or other innocent mental state"

17

(*Ewoldt, supra*, 7 Cal.4th at p. 402) to explain the defendants' behavior on the night of the Gaslamp Quarter incident.[7]

Moreover, even though the defendants do not seriously challenge the joinder of the Pacific Beach and Chula Vista incidents, it is relevant for our consideration of the trial court's severance ruling that the evidence of each of those incidents would also have been cross-admissible in any theoretical separate trial on the other. Certainly, facts demonstrating that the defendants harbored an intent to rob the victim in the Pacific Beach incident were admissible to prove the defendants' intent in the Chula Vista incident, and vice versa, thereby dispelling any prejudice from their joinder, and further cementing their joint role in providing evidence that would logically tend to undermine self-defense or another innocent mental state in connection with their assaultive conduct during the Gaslamp Quarter incident.

The fact that defendants' conduct during the Pacific Beach incident would be admissible in hypothetical separate trials for the Gaslamp Quarter and Chula Vista incidents or, alternatively that their conduct in the Chula Vista incident would be admissible in hypothetical separate trials of the Gaslamp Quarter and Pacific Beach incidents, is sufficient cross-admissibility to negate the potential prejudice from joinder of the charges. And even assuming that evidence regarding the Gaslamp Quarter incident would not

---

7  We emphasize that we do not assess potential prejudice under Evidence Code section 352 in making the cross-admissibility determination in the severance context. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1222, fn. 11 (*Alcala*).) We express no opinion whether the prejudicial effect of evidence of the Gaslamp Quarter incident in a separate trial of the other charges would substantially outweigh its probative value under Evidence Code section 352.

have been admissible as to the other two incidents, that is of no consequence. "As [the Supreme] [C]ourt has explained, ' "two-way" cross-admissibility is not required.' " (*Merriman, supra*, 60 Cal.4th at p. 38.) Rather, "it is sufficient that evidence supporting [one crime or set of] crimes would be admissible in a separate . . . trial [on another crime or set of crimes]." (*Ibid.*)

### ii. *The Remaining Considerations Do Not Demonstrate the Court Abused Its Discretion in Denying Severance*

Even assuming there was no cross-admissible evidence that would have been admitted at hypothetical separate trials, however, the absence of cross-admissibility is not dispositive. (§ 954.1 ["evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact"]; see *Alcala, supra*, 43 Cal.4th at pp. 1221–1222 ["Our decisions also make clear that even the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance. We repeatedly have found a trial court's denial of a motion to sever charged offenses to be a proper exercise of discretion *even when the evidence underlying the charges would not have been cross-admissible in separate trials.*"]; see also *Soper, supra*, 45 Cal.4th at p. 774.) We therefore turn to the remaining factors to assess whether the trial court abused its discretion at the time it denied the renewed severance motion. (*Simon, supra*, 1 Cal.5th at pp. 123–124.)

We first consider whether one set of charges is particularly inflammatory. The defendants argue that the evidence related to the Gaslamp Quarter incident was likely to inflame the jury against them because it involved a stabbing and the death of one of the victims. In particular, they cite to the fact that there was a "gruesome video" of the victim dying in the street and suggest that this evidence would have led the

19

jury to convict on the "very weak robbery related counts from the prior two incidents." While it seems plain that the Gaslamp Quarter events were more likely to inflame the passions of jurors than either the Pacific Beach or Chula Vista incidents, this alone is not the issue. "[T]he animating concern underlying this factor is not merely whether evidence from one offense is repulsive, because repulsion alone does not necessarily engender undue prejudice. [Citation.] Rather, the issue is 'whether " 'strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." ' " (*Simon, supra*, 1 Cal.5th at p. 124.) The *Simon* court explained, for example, that in *Capistrano, supra*, 59 Cal.4th at page 850, the Supreme Court "held that joinder of a brutal rape incident with a separate robbery did not unduly inflame the jury against the defendant." (*Simon*, at p. 124.) This was so "because the evidence of the separate robbery was far from weak," and therefore "there was little risk that details of the rape would have bolstered an otherwise weak robbery charge." (*Ibid.*)

Similarly, here, the evidence supporting the robbery offenses was not particularly weak, dispelling the concern that joining the more inflammatory charges from the Gaslamp Quarter incident would improperly bolster them. As to each incident, the defendants' conduct was testified to by eyewitnesses and/or victims. In the Pacific Beach incident, the victim followed the men and captured a photograph of the Chrysler (which was used by the men at each crime scene) and its license plate. And surveillance video captured much of what occurred as charged in connection with the Chula Vista incident. While the defendants' defense to the two robbery incidents was that they lacked the intent to rob the victims, in both cases, one or both of the defendants either immediately took the unknown victim's property and ran off with it (i.e., Holliday riding away on the bike in Pacific Beach) or

20

attempted to take the victim's property (i.e., both defendants trying to grab the victim's Vans bag at the Chula Vista mall). The circumstantial evidence of the defendants' intent to permanently deprive the victims of their property was strong, particularly given that these victims were strangers to the defendants, which would have made it extremely difficult to return their property. There was thus little risk that the details of the stabbings in the Gaslamp Quarter incident would have improperly bolstered the prospect of conviction in the robbery cases, as the defendants suggest.

This same reasoning prompts us to reject the defendants' contention that the court's denial of severance would permit a spillover effect by allowing a weak case to be tried alongside a strong case. "The core prejudice concern arising in connection with this issue is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials." (*Simon, supra*, 1 Cal.5th at p. 127.) "This concern is especially pronounced when evidence of a lesser but inflammatory incident might be used to bolster a weak prosecution case as to another incident." (*Ibid.*) As previously discussed, however, even where evidence from one incident could be considered "inflammatory," a reviewing court "will find no abuse of discretion if the evidence of guilt for each of the joined incidents is sufficiently compelling [citation]." (*Ibid.*) The evidence as to each of the three incidents could not be considered weak. There was no question that the defendants were the perpetrators and that they engaged in the observed conduct. The only real question was whether either defendant had the requisite criminal intent for conviction on any particular charge, and with respect to the mental state element of the charged offenses, there was ample circumstantial evidence. As discussed above, there was substantial circumstantial evidence of the defendants' intent to use force or fear to

permanently deprive the victims of their property. So, too, was there substantial circumstantial evidence of the defendants' intent in connection with the offenses arising out of the Gaslamp Quarter incident.[8] The defendants—one armed with a deadly weapon—approached the first victim and behaved menacingly. Holliday then struck him from behind without warning. When the victim's friends tried to help, Esqueda's immediate response was to plunge his specialty knife into vulnerable parts of the bodies of two other men. Thus, we simply cannot say that the joining of the robbery cases to the Gaslamp Quarter case was likely to cause an improper spillover effect.

Further, even if there was some concern that one of the three cases was relatively weaker than the other two, we cannot say that there was a *uniquely* weak case among the three. "[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper, supra*, 45 Cal.4th at p. 781; see *People v. Ruiz* (1988) 44 Cal.3d 589, 606 [severance not required of two properly joined murder charges even though evidence underlying one charge was "relatively weak" and was made "much stronger" by the evidence underlying the second charge]; see also *People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1436 ["There must be an 'extreme disparity' in the strength of the evidence."].) "[T]he benefits of joinder are not outweighed—and severance is not required—merely because

---

[8]    We address the sufficiency of the evidence to support Esqueda's conviction for premeditated murder and attempted murder in parts III.B.1 & 2.

properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried." (*Soper*, at p. 781.) Here, there was substantial evidence that would likely have merited conviction in each of the cases had the incidents been tried separately. The fact that the joinder may have made it more difficult for Esqueda and Holliday to avoid conviction does not make the denial of severance an abuse of discretion.

The final consideration in assessing potential prejudice from the denial of a severance motion is whether the joinder of charges turned an otherwise noncapital case into a capital case. (*Soper, supra*, 45 Cal.4th at p. 780.) None of the charges at issue placed either defendant at risk of capital punishment, and, consequently, this factor does not "militate[ ] against the benefits of joinder in the present proceedings." (*Ibid.*)

iii.  *The Joint Trial Was Not so Unfair as to Constitute a Constitutional Violation*

Finally, in the second step of review of the denial of a motion to sever, "we must . . . determine 'whether events *after* the court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's constitutional right to fair trial or due process of law.' " (*Simon, supra*, 1 Cal.5th at p. 130.) "In determining whether joinder resulted in gross unfairness, we have observed that a judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Id.* at pp. 129–130.) We conclude that the joint trial of the offenses arising out of the robbery incidents and the Gaslamp Quarter incident did not amount to a constitutional violation.

First, "[a]ppellate courts have found ' "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." ' " (*Soper, supra*,

45 Cal.4th at p. 784.) Here, the evidence underlying each set of charges was relatively straightforward and distinct. Moreover, as we mentioned in part III.A.1.c.ii, the evidence related to the charges was independently sufficient to support defendants' convictions in connection with each incident. And, again, while there was a greater likelihood that the facts pertaining to the Gaslamp Quarter incident would inflame the jury than the facts pertaining to the other two incidents, we cannot say that the facts were likely to *unduly* inflame jurors' passions.

The defendants both complain that unfairness flowed from the prosecutor's closing argument, which they contend improperly encouraged the jury to use the evidence in a manner prohibited by Evidence Code section 1101, subdivision (a). According to the defendants, a joint trial allowed the prosecutor to use facts from all three incidents to argue that the evidence demonstrated the defendants' propensity to commit the other crimes. For example, Holliday argues that the prosecutor used the Pacific Beach and Chula Vista incidents "to argue these incidents showed guilt on the Gaslamp homicide case." But the prosecutor relied on the evidence of the assaultive nature of those two events to argue that the defendants similarly had a non-innocent intent, and were not acting in self-defense, when they initiated an interaction with Chris during the Gaslamp Quarter incident. This is not the same as suggesting the defendants had a propensity to commit crimes in general.

Further, "even if the prosecution's closing arguments occasionally 'encouraged the jury to aggregate the evidence,' " this "record does not suggest that the jury was unable to decide each count separately as it was specifically instructed to do." (*People v. Gomez* (2018) 6 Cal.5th 243, 277 (*Gomez*).) Specifically, Holliday's jury acquitted him of the murder,

24

concluding instead that he was guilty only of involuntary manslaughter. This tends to show that Holliday's "jury was capable of, and did, differentiate among [the differing] crimes" (*People v. Jones* (2013) 57 Cal.4th 899, 927), and did not simply aggregate the evidence from the different incidents without weighing them independently (see *Gomez*, at p. 277). And while Esqueda's jury convicted him on all counts as charged, we do not view this result to be a function of his jury's improper aggregation of the evidence. Rather, it reflects the strength of the evidence supporting the charges pursued by the People. Indeed, Esqueda's jury was instructed on the elements as to each charged crime and the burden of proof for conviction. The jury was also instructed with CALCRIM No. 3515 that "[e]ach of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." This instruction is essentially identical to the instruction relied on by the Supreme Court in *Soper*, when considered along with instructions as to the elements of the crimes charged and the burden of proof, in concluding that the instructions as a whole "mitigated the risk of any prejudicial spillover" from joinder. (*Soper, supra*, 45 Cal.4th at p. 784.)

Considering the proceedings in their entirety, we conclude that the joinder of all the counts alleged did not result in a grossly unfair trial.

2. *The Failure to Instruct on Simple Assault as a Lesser Included Offense to Count 3*

Both Esqueda and Holliday were charged in count 3 with assault by force likely to produce great bodily injury related to the attack on Chris. Holliday was charged as the direct perpetrator of the act, while Esqueda was charged with the same offense as a coconspirator. Although neither defendant raised the issue in the trial court, both argue on appeal that the

25

trial court erred in failing to instruct the jury on the offense of simple assault as a lesser included offense of the charge in count 3.

a. *Additional Background*

During the colloquy regarding jury instructions, the court stated its intention to instruct on the offense charged in count 3 by giving a version of CALCRIM No. 875 (ultimately given as "Assault With Force Likely to Produce Great Bodily Injury (Pen. Code, § 245(a)(4))"). The court then indicated its intention to also instruct on simple battery based on CALCRIM No. 960 ("Simple Battery (Pen. Code, § 242)"). When Esqueda's attorney expressed confusion about where the jury instructions being discussed were located in the packet of proposed jury instructions, the prosecutor said, "[CALCRIM No.] 960 is the battery–is the [lesser included offense of Penal Code section] 245." Esqueda's counsel responded, "Oh, okay." There was no discussion about whether CALCRIM No. 960 was, in fact, an instruction on a lesser included offense to assault with force likely to produce great bodily injury, nor was there discussion on whether any other lesser included instruction was warranted.

Ultimately, both juries were properly instructed on the elements necessary to prove guilt on the charged offense, assault by force likely to produce great bodily injury. They were also both given an instruction on

simple battery, which included an introductory statement telling the jury that simple battery is "[a] lesser included offense of Count 3."[9]

b. *Analysis*

A lesser included offense is an offense that is encompassed within the charged offense. (*People v. Lopez* (2020) 9 Cal.5th 254, 269.) A trial court has a sua sponte duty to instruct on a lesser included offense whenever the evidence would support a reasonable jury in concluding that the defendant is not guilty of the charged offense but is guilty of the lesser included offense. (*People v. Avila* (2009) 46 Cal.4th 680, 704–705 (*Avila*).) However, "the obligation to instruct on a lesser included offense does not arise when there is no evidence that the offense was less than that charged." (*People v. Wyatt* (2012) 55 Cal.4th 694, 702–703.) "On appeal, we review independently . . . whether the trial court improperly failed to instruct [the jury] on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

Simple assault (§ 240) is a lesser included offense of assault by means of force likely to cause great bodily harm (§ 245, subd. (a)(4)). One cannot commit the aggravated form of assault, as was charged in count 3, without also committing a simple assault. (*People v. Berry* (1976) 18 Cal.3d 509, 518–519; *People v. Yeats* (1977) 66 Cal.App.3d 874, 879.) In general, therefore, unless there is no substantial evidence that the defendant

---

[9] Simple battery is not a lesser included offense of assault with a deadly weapon under the statutory elements test (see *People v. Jones* (1981) 119 Cal.App.3d 749, 754), but it may be under the accusatory pleading test. The accusatory pleading test is inapplicable here since the operative information did not modify the statutory language of assault with a deadly weapon to include facts encompassing battery. (See *People v. Alvarez* (2019) 32 Cal.App.5th 781, 786.) Neither defendant raises any issue on appeal regarding the court's instruction on simple battery.

27

committed only the lesser and not the greater offense, the court has a sua sponte duty to instruct on simple assault when the aggravated form of assault is charged.

We need not consider whether the evidence in this case required the court to provide an instruction on simple assault, however, because even if the court erred in failing to provide such an instruction, the defendants cannot show they were prejudiced by the lack of a simple assault instruction.

Failure to instruct on a lesser included offense in a noncapital case is reviewed for harmlessness under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) Under this standard, the failure to provide instruction on a lesser included offense "is harmless unless there is a reasonable probability of a different result absent the error." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 200, fn. 4 (*Gonzalez*).)

The prejudice arising from the failure to instruct on a lesser included offense is the risk that the jury ignored its instructions and convicted the defendant of an offense for which the prosecution did not carry its burden. In such a scenario, the jury might have been convinced that the defendant was guilty of a lesser included offense and, as a result, was tempted to convict of a greater offense rather than acquit the defendant altogether. (*Gonzalez, supra*, 5 Cal.5th at p. 200, citing *People v. Eid* (2014) 59 Cal.4th 650, 657.)

Here, however, the defendants' juries were not given an all-or-nothing choice with respect to count 3, despite the lack of a simple assault instruction. Rather, both juries were instructed not only on the charged offense, which included a requirement of a finding that the "force used was likely to produce great bodily injury," but also on the lesser related offense of simple battery, which did not include this element. Thus, had either jury believed that the strike Holliday committed against Chris did not involve

28

force likely to produce bodily injury, that jury could have opted to convict on the lesser related offense of simple battery. Neither jury did so. And since there was no evidence from which a jury could have concluded that *no* touching occurred, the main questions for the jury were whether Holliday used force likely to cause great bodily injury in striking Chris and/or whether Holliday was acting in self-defense when he struck Chris. In the face of this, both juries rejected the idea that the strike against Chris involved something *less* than force likely to produce great bodily injury. There is no reasonable likelihood that these juries would have opted to convict these defendants of simple assault when those same juries rejected convictions on simple battery in favor of convicting the defendants of assault with force likely to cause great bodily injury.

As a result, the defendants cannot demonstrate that they were prejudiced by the lack of an instruction on simple assault as a lesser included offense to the offense charged in count 3.

3. *The Modified Version of CALCRIM No. 375 Given at Trial Impermissibly Lowered the Prosecution's Burden of Proof as to the Pacific Beach and Chula Vista Charges*

In its unmodified form, CALCRIM No. 375 is a limiting instruction entitled, "Evidence of *Uncharged* Offense to Prove Identity, Intent, Common Plan, etc." (Italics added.) As its title suggests, CALCRIM No. 375 is designed for use when evidence of *uncharged* offenses is admitted at trial to prove a fact such as identity, intent, or common plan under Evidence Code section 1101, subdivision (b).[10] This standard instruction permits the jury to

_____

[10] Evidence Code section 1101, subdivision (a) generally prohibits evidence of other offenses to prove disposition or bad character, but

consider evidence of an *uncharged* offense for such a limited purpose only if the People have proven by a preponderance of the evidence that the defendant committed the uncharged offense. But the trial court here modified this CALCRIM instruction to cover the jury's use of evidence of the *charged* Pacific Beach and Chula Vista offenses. In doing so, the court retained the preponderance of the evidence language used in the form instruction for uncharged offenses. Both defendants contend that this impermissibly lowered the prosecution's burden of proving their guilt of the charged offenses beyond a reasonable doubt. We agree that the modified instruction impermissibly lowered the prosecution's burden of proof as to the Pacific Beach and Chula Vista crimes, but not the Gaslamp Quarter crimes.

a. *Additional Background*

The appellate record does not include the packets of jury instructions requested by the parties. During trial, the attorneys and the court extensively discussed jury instructions off the record. In a reported proceeding conducted after the defense rested, the court recited the instructions it had apparently agreed to give off the record and entertained further objections and discussion.

During this on-the-record proceeding, the court and counsel briefly discussed CALCRIM No. 375. The court asked the attorneys, "[CALCRIM No.] 375, we're going to modify that just to include intent; correct?" The prosecutor responded, "Yup." Esqueda's counsel clarified, "As to [Pacific Beach] and Chula Vista but not to Gaslamp," and Holliday's counsel agreed with Esqueda's attorney, saying, "Right. There's going to be a line in there that says 'apply to.'" The prosecutor then said, "I'll put as to apply in

---

subdivision (b) states that the rule does not prohibit such evidence when relevant to prove some other fact such as identity or intent.

30

count—in which counts those are associated with in terms of Counts 5 and 7." The court stated, "All right. That works." There was no other discussion of CALCRIM No. 375 on the record.

At trial, the court instructed both juries with a modified version of CALCRIM No. 375 as follows:

> "The People presented evidence that the defendants committed other offenses that were charged in this case.
>
> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the acts. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
>
> "If the People have not met this burden, you must disregard this evidence entirely.
>
> "If you decide that the defendant committed the acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:
>
>> "A. Intent.
>>
>> "The defendant acted with the intent to steal from the victims in this case; or [*sic*]
>
> "This instruction applies to the evidence presented for Counts 5–7 [April 2017 Pacific Beach and Chula Vista Incidents].
>
> "In evaluating this evidence, consider the similarity or lack of similarity between the charged offenses.
>
> "If you conclude that the defendant committed any of the acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to

31

prove that the defendant is guilty of any other crime. The People must still prove each charge and allegation beyond a reasonable doubt."

The court also instructed the jury with CALCRIM No. 220 on the requirement of proof beyond a reasonable doubt. Other instructions also referred to the requirement of proof beyond a reasonable doubt.

b. *A Reasonable Juror Would Have Understood the Modified Version of CALCRIM No. 375 to Apply Only to the Pacific Beach and Chula Vista Charges*

We begin by considering which charges a reasonable juror could have understood the modified version of CALCRIM No. 375 to apply to. As the defendants note, the first two sentences of the instruction created a potential for confusion because they did not identify what specific offenses or acts they pertained to. Although the standard CALCRIM instruction includes blank lines for the trial court to specify what "other offense" or "other act" the instruction is addressing, the trial court here did not fill in these blank lines. As a result, the first two sentences of the instruction as given merely stated: "The People presented evidence that the defendants committed other offenses that were charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the acts." Without any further clarification, the jurors would have been left to wonder what "other offenses" or "acts" the instruction was referring to.

Later in the instruction, however, the trial court added the following qualification: "This instruction applies to the evidence presented for Counts 5–7 [April 2017 Pacific Beach and Chula Vista Incidents]." The jury would have understood from this that the instruction applied only to evidence

32

of those specified charges, not the December 2017 Gaslamp Quarter charges. Moreover, the instruction allowed the jury to consider this evidence for the limited purpose of determining whether the defendants acted with the intent to steal, which was not an element of the Gaslamp Quarter charges as finally submitted to the jury. By first stating that the jury could consider "this evidence" if the acts were proven by a preponderance of the evidence, then later clarifying that this applied only to "the evidence presented" for the Pacific Beach and Chula Vista charges, and finally stating that this evidence could be considered for the limited purpose of proving intent to steal, the instruction taken as a whole adequately conveyed to the jury that it did not apply to the Gaslamp Quarter charges. Although the instruction was confusing in other respects, as we discuss below, we nevertheless conclude there is no reasonable possibility any juror would have understood it to apply to the Gaslamp Quarter charges.

c. *Summary of Relevant Case Law on Use of Preponderance Standard for Limiting Instruction on Other Crimes Evidence*

The issue before us is whether the modified version of CALCRIM No. 375 impermissibly reduced the prosecution's burden of proof beyond a reasonable doubt.[11] The due process clause of the Fourteenth Amendment

---

[11] We review such a claim of jury instruction error under the de novo standard. (*People v. Cruz* (2016) 2 Cal.App.5th 1178, 1183 (*Cruz*).) Although the record does not reflect that either defendant made any objection to this instruction below, the People do not argue waiver, forfeiture, or invited error. Even without an objection, we must consider this claim because an instructional error lowering the prosecution's burden of proof would affect the defendants' substantial rights. (§ 1259; *People v. Kerley* (2018) 23 Cal.App.5th 513, 542 [considering defendant's claim that other crimes instruction impermissibly lowered prosecution's burden of proof

"requires that each element of a crime be proved to a jury beyond a reasonable doubt." (*Hurst v. Florida* (2016) 577 U.S. 92, 97; see also *In re Winship* (1970) 397 U.S. 358, 364 ["we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"].) Moreover, a trial court must instruct the jury sua sponte on the presumption of innocence and the state's burden of proof beyond a reasonable doubt. (*People v. Vann* (1974) 12 Cal.3d 220, 225–227.)

Our Supreme Court has ruled that when evidence of an *uncharged* offense is used to prove disposition under Evidence Code section 1108 or 1109,[12] and the jury is properly instructed that the *charged* offense must be proven beyond a reasonable doubt, it does not unconstitutionally lower the burden of proof to allow the jury to use a preponderance of the evidence standard in deciding whether the defendant committed the uncharged offense. (*People v. Loy* (2011) 52 Cal.4th 46, 71–77; *People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1016.) The court reasoned that such a limiting instruction only authorizes the jury to use the preponderance standard in making the preliminary determination whether the defendant committed a prior *uncharged* offense, and it is not reasonably likely the jury would interpret such an instruction to authorize conviction of the *charged* offense based on a lowered standard of proof. (*Loy*, at p. 77.) In this context, jurors can reasonably be expected to "grasp their duty . . . to apply the preponderance-of-the-evidence standard to the preliminary fact identified in

notwithstanding absence of objection in trial court]; *Cruz, supra*, at p. 1183 [same].)

[12] Evidence Code sections 1108 and 1109 permit the use of propensity evidence for sexual offenses and domestic violence.

34

the instruction [the defendant's commission of the uncharged offense] and to apply the reasonable-doubt standard for all other determinations." (*Reliford*, at p. 1060; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 380–383 [preponderance standard also applies to evidence of uncharged crimes admitted for nonpropensity purposes under Evidence Code section 1101].)

In *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), however, the Supreme Court suggested that a different rule applies when a *charged* offense is used as evidence of the defendant's propensity to commit *other* charged sexual offenses under Evidence Code section 1108. There, the defendant argued that a modified version of CALCRIM No. 1191 given to the jury "failed to designate clearly what standard of proof applied to the charged offenses before the jury could draw a propensity inference from them." (*Villatoro*, at p. 1167.) After first concluding that charged sexual offenses may be used as propensity evidence under Evidence Code section 1108 (*Villatoro*, at pp. 1159–1167), the Supreme Court rejected the defendant's jury instruction argument. It reasoned that the trial court had modified CALCRIM No. 1191 to delete its preponderance language, so that the modified version "did not provide that the charged offenses used to prove propensity must be proven by a preponderance of the evidence." (*Villatoro*, at pp. 1167–1168.) "Instead, the instruction clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity." (*Id.* at p. 1168.) "Thus, there was no risk the jury would apply an impermissibly low standard of proof." (*Ibid.*)

In a concurring and dissenting opinion, Justice Corrigan concluded that the limiting instruction should not have been given at all because it was unnecessary and potentially confusing. (*Villatoro, supra*, 54 Cal.4th at pp. 1179–1182 (conc. & dis. opn. of Corrigan, J.).) She reasoned that

"[e]vidence pertaining to the charged crimes is not admitted for a limited purpose, and no instruction is needed to tell the jury of its possible relevance." (*Id.* at p. 1180 (conc. & dis. opn. of Corrigan, J.).) Justice Corrigan also noted the potential for juror confusion and erosion of the presumption of innocence. (*Id.* at p. 1181 (conc. & dis. opn. of Corrigan, J.).) She explained: "CALCRIM Nos. 375 and 1191 explain that the jury need only find that the defendant committed the uncharged acts by a preponderance of the evidence before it can rely on the uncharged acts to support a specific inference. If the same preponderance standard is applied to charged offenses . . . , there is a serious risk of confusion. Requiring the jury to apply two standards of proof to evidence of the *same crime* would inevitably lead to confusion and could potentially erode the presumption of innocence." (*Ibid.*)

The *Villatoro* majority "did not expressly hold that currently charged offenses must be proved beyond a reasonable doubt before they can be used to show a propensity under Evidence Code section 1108, but it strongly implied that rule. It relied on an instruction requiring such proof to refute the defendant's argument that there was a risk the jury applied an impermissibly low standard." (*Cruz, supra*, 2 Cal.App.5th at p. 1186; see also *People v. Gonzales* (2017) 16 Cal.App.5th 494, 505 (conc. opn. of Perren, J.) ["our Supreme Court implicitly recognized that charged offenses offered as propensity evidence must be proven beyond a reasonable doubt"].)

In *Cruz, supra*, 2 Cal.App.5th 1178, the court found that a jury instruction given on the use of *charged* sexual offenses to prove the defendant's propensity to commit other charged sexual offenses impermissibly lowered the prosecution's burden of proof because it referred to a preponderance of the evidence standard. As given, the instruction stated in relevant part: " 'If you find, by a preponderance of the evidence, that the

36

defendant committed any such other sexual offense you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses. [¶] If you find that the defendant had this disposition you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused. [¶] However, even though you find by [a] preponderance of the evidence that the defendant committed another sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes you are determining. [¶] If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider along with all other evidence in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crimes that you are determining. [¶] You must not consider this evidence for any other purpose.' " (*Id.* at p. 1184.)

The *Cruz* court concluded that this instruction "presented the jury with a nearly impossible task of juggling competing standards of proof during different phases of its consideration of the same evidence." (*Cruz, supra*, 2 Cal.App.5th at p. 1187.) "A robot or a computer program could be imagined capable of finding charged offenses true by a preponderance of the evidence, and then finding that this meant the defendant had a propensity to commit such offenses, while still saving for later a decision about whether, considering all the evidence, the same offenses have been proven beyond a reasonable doubt. A very fastidious lawyer or judge might even be able to do it. But it is not reasonable to expect it of lay jurors. We believe that, for practical purposes, the instruction lowered the standard of proof for the determination of guilt." (*Id.* at p. 1186.)

Although the *Cruz* court acknowledged that the trial court had also given a proper jury instruction on the reasonable doubt standard, and that

37

"[o]ther instructions reiterated that the reasonable-doubt standard applied to the ultimate question of guilt" (*Cruz, supra*, 2 Cal.App.5th at p. 1184), it nevertheless found that "the combination of that instruction with the preponderance instruction for charged offenses produced a hopeless muddle." (*Id*. at p. 1186.)  It further concluded that under the holding of *People v. Aranda* (2012) 55 Cal.4th 342 (*Aranda*), "an instructional error that has the effect of lowering the reasonable doubt standard for guilt is one of the few errors deemed 'structural' and therefore reversible per se." (*Cruz*, at p. 1187.) Accordingly, the court reversed the judgment without conducting a harmless error analysis.  (*Ibid.*)[13]

In *People v. Nicolas* (2017) 8 Cal.App.5th 1165 (*Nicolas*), the court found a similar error to be reversible per se.  The trial court there gave a modified version of CALCRIM No. 375 on uncharged acts in a prosecution for vehicular manslaughter with gross negligence.  As modified, the instruction identified the defendant's uncharged acts as using a cell phone to call and text (while driving); it told the jury it could consider this evidence only if the

---

[13]    Following *Villatoro* and *Cruz*, all of the standard CALCRIM instructions on use of *charged* offenses to prove a defendant's propensity to commit *other* charged offenses now require proof beyond a reasonable doubt before the evidence may be considered for this purpose.  (CALCRIM No. 852B [Evidence of Charged Domestic Violence]; CALCRIM No. 853B [Evidence of Charged Abuse of Elder or Dependent Person]; CALCRIM No. 1191B [Evidence of Charged Sex Offense].)  By contrast, the standard CALCRIM instructions on use of *uncharged* offenses to prove propensity still only require proof of the uncharged offenses by a preponderance of the evidence. (CALCRIM No. 852A [Evidence of Uncharged Domestic Violence]; CALCRIM No. 853A [Evidence of Uncharged Abuse of Elder of Dependent Person]; CALCRIM No. 1191A [Evidence of Uncharged Sex Offense].)  There is no CALCRIM instruction on use of *charged* offenses for nonpropensity purposes in deciding guilt of other charged offenses under Evidence Code section 1101, subdivision (b).

People had proved the uncharged acts by a preponderance of the evidence; it allowed the jury to consider the uncharged acts to show intent, knowledge, and lack of mistake or accident; and it stated that this evidence was not sufficient by itself to prove guilt and the People still had to prove the charged offense beyond a reasonable doubt. (*Id.* at pp. 1177–1178.)

The *Nicolas* court concluded that this instruction was erroneous because there were in fact no uncharged acts—the defendant's phone use while driving was an indivisible part of the charged offense of vehicular manslaughter with gross negligence. (*Nicolas, supra*, 8 Cal.App.5th at p. 1178.) Relying on *Aranda* and *Cruz*, the court also found that this was "the rare type of error that requires reversal per se" because the instruction's preponderance of evidence language effectively lowered the prosecution's burden of proof. (*Id.* at pp. 1179–1180.) "The instruction told the jury that the evidence concerning defendant's phone use immediately prior to the collision could be proven under a preponderance of the evidence standard. This had the effect of lowering the prosecution's burden of proof because this was *the same evidence* that the prosecution was using to prove gross negligence." (*Id.* at p. 1181.) Even though the trial court had also instructed on the reasonable doubt standard, "the two competing standards of proof were addressing *the same evidence*. The court's instructional error not only presented the jury 'with a nearly impossible task,' but as a reviewing court, we have absolutely no way of knowing which of the two competing standards of proof the jury may have applied to *the same evidence*." (*Id.* at p. 1182.)

The majority in *People v. Jones* (2018) 28 Cal.App.5th 316 (*Jones*) reached a different conclusion. In *Jones*, the trial court gave a modified version of CALCRIM No. 375, which allowed the jury to consider evidence of an uncharged burglary and five charged burglaries to show intent and

39

identity as to the charged burglaries under Evidence Code section 1101, subdivision (b). Even though the modified instruction referred to a preponderance of the evidence standard for evidence of the charged *and* uncharged burglaries, the court found *Cruz* to be distinguishable and concluded that the instruction did not lower the prosecution's burden of proof. The court reasoned that *Cruz* involved propensity evidence under Evidence Code section 1108, rather than nonpropensity evidence under Evidence Code section 1101, subdivision (b). (*Jones*, at pp. 328–330.) According to the *Jones* majority, the propensity instruction in *Cruz* allowed the jury to use a charged sex offense to "directly infer that the defendant was guilty of other charged sex offenses" (*id.* at p. 328), whereas the instruction on intent and identity given in *Jones* "did not allow the jury to use the evidence of charged auto burglaries proven by a preponderance of the evidence to directly infer that Jones committed other charged offenses." (*Id.* at p. 329.)[14] The majority nevertheless went on to criticize the instruction at issue as unnecessary and confusing based on Justice Corrigan's concurring and dissenting opinion in *Villatoro*. (*Jones, supra*, 28 Cal.App.5th at pp. 330–331.)

---

[14] We note that the *Jones* majority based its decision in part on a misreading of the jury instruction given in *Cruz*. The *Jones* majority stated: "[U]nlike the challenged instruction [in *Jones*] (which stated evidence Jones committed a charged auto burglary was *not* sufficient to prove guilt as to other charged offenses), the *Cruz* instruction did not state that the propensity evidence by itself was insufficient to prove guilt of a charged crime." (*Jones, supra*, 28 Cal.App.5th at p. 330, fn. 12.) In reality, however, the instruction given in *Cruz* explicitly stated: " 'However, even though you find by [a] preponderance of the evidence that the defendant committed another sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes you are determining.' " (*Cruz, supra*, 2 Cal.App.5th at p. 1184.)

40

Presiding Justice Kline dissented in *Jones*.  He concluded:  "Application of the challenged instruction—which requires jurors to employ different standards of proof to the same evidence for different purposes—may be clearly discernible to trained legal minds but it strains credulity to think its application is apparent to many lay jurors. . . .  [T]he instruction is unfortunately amenable to erroneous interpretations which effectively lower the prosecution's burden to prove guilt and thereby deprive defendants of the due process guaranteed by the Fourteenth Amendment."  (*Jones, supra*, 28 Cal.App.5th at p. 334 (dis. opn. of Kline, P. J.).)  He found "no meaningful distinction between the instruction in this case and that in *Cruz*."  (*Id.* at pp. 338–339 (dis. opn. of Kline, P. J.).)  "The findings that the defendant is the person who committed the offense (identity) and that he or she intended that act [are] no less probative of guilt than a finding of propensity."  (*Id.* at p. 339 (dis. opn. of Kline, P. J.).)  "[T]he majority's effort to distinguish *Cruz* based on the differences between section 1108 and 1101, subdivision (b) are unconvincing."  (*Ibid.*)  Presiding Justice Kline also explained that the "confusing instruction" made it likely jurors "would improperly engage in the bootstrapping of verdicts by using verdicts on some counts to conclude appellant committed the offenses charged in other counts" and "would use multiple counts, decided by a preponderance of the evidence, to find that appellant committed all of his crimes beyond a reasonable doubt."  (*Id.* at p. 341.)  In his view, the error was reversible per se because it effectively lowered the prosecution's burden of proving guilt beyond a reasonable doubt. (*Id.* at pp. 340–341.)

41

d.  *The Instruction's Use of a Preponderance of Evidence Standard with Respect to the Charged Pacific Beach and Chula Vista Offenses Requires Reversal of Those Convictions*

As to the Pacific Beach and Chula Vista offenses, we conclude that the modified version of CALCRIM No. 375 given in this case suffers from the same constitutional infirmity as the instructions given in *Cruz* and *Nicolas*. As those cases recognized, a preponderance of the evidence standard has no place in a jury instruction on evidence of *charged* offenses. Using preponderance language in a jury instruction addressing evidence of the charged offenses poses an inherent risk of confusing the jury and lowering the prosecution's burden of proof beyond a reasonable doubt. The majority in *Villatoro* implicitly recognized that giving such an instruction would "impermissibly lower the standard of proof or otherwise interfere with defendant's presumption of innocence." (*Villatoro, supra*, 54 Cal.4th at p. 1168.) Justice Corrigan's separate opinion (joined by Justice Werdegar) similarly noted: "If the same preponderance standard is applied to charged offenses . . . , there is a serious risk of confusion. Requiring the jury to apply two standards of proof to evidence of the *same crime* would inevitably lead to confusion and could potentially erode the presumption of innocence." (*Id.* at p. 1181 (conc. & dis. opn. of Corrigan, J.).)

The instruction given here was particularly troubling because it invited the jury to apply a preponderance of the evidence standard in deciding an essential element of the Pacific Beach and Chula Vista offenses. As phrased, the instruction never actually explained to the jury that it was intended to guide the jury's use of evidence of one charged crime in determining the defendants' guilt of another charged crime. Rather, it merely stated that the People had presented evidence of "other offenses that were charged in this

42

case" (later identified as the Pacific Beach and Chula Vista offenses), and that if those offenses were proven by a preponderance of the evidence, the jury could consider them to decide whether "[t]he defendant acted with the intent to steal *from victims in this case*." (Italics added.) Thus, the jury could reasonably have understood that the instruction allowed it to use a preponderance standard in deciding whether evidence of the charged Pacific Beach crimes proved the defendants acted with an intent to steal *from the victims in the Pacific Beach crimes*—and likewise for the Chula Vista crimes. This effectively lowered the prosecution's burden of proving intent to steal beyond a reasonable doubt as an essential element of the charged robbery and conspiracies to commit robbery.

Even if the instruction had been more carefully worded to express its intended purpose, the preponderance language would still be problematic. As in *Cruz*, we cannot reasonably expect lay jurors to understand an instruction essentially requiring that they first apply a preponderance of evidence standard to determine whether a charged offense is true, then decide whether this means that the defendants had an intent to steal for another charged offense, "while still saving for later a decision about whether, in light of all the evidence, the same offenses have been proven beyond a reasonable doubt." (*Cruz, supra*, 2 Cal.App.5th at p. 1186.) The risk of juror confusion and dilution of the burden of proof is just as great as it was in *Cruz*. We expect much from jurors, but this level of mental gymnastics is beyond the capacity of most mortals. Even the most conscientious and attentive juror could have been misled by such a convoluted instruction with two different standards of proof for the same evidence.

We acknowledge that the last sentence of this instruction emphasized the reasonable doubt standard, and the trial court also gave other jury

43

instructions on proof beyond a reasonable doubt. But the same was true in both *Cruz* and *Nicolas*. As in those cases, the conflicting standards only "produced a hopeless muddle." (*Cruz, supra*, 2 Cal.App.5th at p. 1186.) As a result, we cannot be certain what standard of proof the jury applied to these charges or the intent to steal element. (*Nicolas, supra*, 8 Cal.App.5th at p. 1182; see also *People v. Johnson* (2004) 115 Cal.App.4th 1169, 1170–1172 [trial court's error in "amplifying on the reasonable doubt instruction" effectively lowered the prosecution's burden of proof and required reversal].) We conclude there is at least a reasonable possibility a juror would have understood the preponderance language of this instruction to reduce the prosecution's burden of proving the Pacific Beach and Chula Vista charges beyond a reasonable doubt.

Like the dissent in *Jones*, we are not convinced by the *Jones* majority's distinction between (1) a preponderance standard for charged offenses used as propensity evidence under Evidence Code section 1108 or 1109 and (2) a preponderance standard for charged offenses used as nonpropensity evidence under Evidence Code section 1101, subdivision (b). In either scenario, it improperly lowers the prosecution's burden of proof to instruct the jury with a preponderance of the evidence standard for consideration of *charged* offenses. (See *Nicolas, supra*, 8 Cal.App.5th at pp. 1176–1182 [reversible error under *Cruz* even though the modified version of CALCRIM No. 375 given to the jury only allowed nonpropensity inferences under Evidence Code section 1101, subdivision (b), not propensity inferences under Evidence Code section 1108 or 1109].) The danger of using such preponderance language is present no matter which provision of the Evidence Code is being invoked or for what evidentiary purpose.

44

In fact, the error may be even more serious when the limiting instruction goes to an essential element of the crimes, as in this case, rather than propensity. Propensity is not an essential element of any criminal offense. A defendant's propensity to commit a crime is merely an evidentiary fact. (*People v. Anderson* (2012) 208 Cal.App.4th 851, 896–897.) The requirement of proof beyond a reasonable doubt applies to the essential elements of the crime, not mere evidentiary facts. (See *People v. Medina* (1995) 11 Cal.4th 694, 763.) Here, intent to steal was not just an evidentiary fact; it was an essential element of the charged Pacific Beach and Chula Vista robbery and conspiracy to commit robbery charges, which the prosecution was required to prove beyond a reasonable doubt. As we have explained, the preponderance language of the instruction improperly diluted the prosecution's burden of proving this essential element.[15]

---

[15] We also agree with Justice Corrigan's concurring and dissenting opinion in *Villatoro* that it is inherently confusing to give a limiting instruction on evidence of charged offenses not admitted for a limited purpose. For example, the instruction here allowed the jury to consider evidence of the charged Pacific Beach or Chula Vista crimes only for the "limited purpose" of determining whether the defendants had the intent to steal from the victims. Taken literally, this would mean the jury could *not* consider evidence of the Pacific Beach crimes in deciding any element of the Pacific Beach crimes *other* than intent to steal—and the same would be true for the Chula Vista crimes. The result would have been to make conviction of either set of crimes impossible because only the intent element could be proven. We do not believe any reasonable juror would have adopted such an absurd interpretation, but it nicely illustrates Justice Corrigan's point that no limiting instruction should be given for evidence of charged offenses because such evidence is not admitted for a limited purpose. (*Villatoro, supra*, 54 Cal.4th at pp. 1179–1181 (conc. & dis. opn. of Corrigan, J.).) We express no view, however, whether a defendant is entitled upon request to a jury instruction stating that evidence of one charged offense may not be considered as evidence of general criminality tending to prove guilt of another

This error is reversible per se and requires automatic reversal of the Pacific Beach and Chula Vista convictions in counts 5 through 7, regardless of the strength of the evidence. (*Nicolas, supra*, 8 Cal.App.5th at pp. 1179–1180; *Cruz, supra*, 2 Cal.App.5th at pp. 1186–1187.) "An instruction that effectively lowers the prosecution's burden of proving guilt beyond a reasonable doubt is structural error because it 'vitiates *all* the jury's findings' and its effect on the verdict is 'necessarily unquantifiable and indeterminate.'" (*Aranda, supra*, 55 Cal.4th at p. 365, quoting *Sullivan v. Louisiana* (1993) 508 U.S. 275, 281–282.) We conclude, however, that this error does not require reversal of the Gaslamp Quarter convictions because the erroneous instruction did not apply to those charges.

B.   *Issues Esqueda Raises*[16]

1.   *There Is Substantial Evidence to Support the Jury's Determination that Esqueda Premeditated the Murder*

Esqueda contends there was insufficient evidence to support the jury's finding that he murdered Ryan with premeditation and deliberation. We disagree.

In assessing the sufficiency of the evidence to support a conviction, a reviewing court views the record "in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty

---

charged offense. (See *id.* at pp. 1184–1185 (conc. & dis. opn. of Liu, J.) [characterizing this as "an open question"].)

[16]   One of Esqueda's contentions on appeal relates to statements the court made at sentencing regarding his eventual suitability for parole. Holliday also raises two challenges to his own sentence. Because we are reversing three of the defendants' six convictions, the defendants' sentences are necessarily vacated, rendering these sentencing challenges moot.

beyond a reasonable doubt." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.) In doing so, we "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) Thus, even where the evidence of guilt is largely circumstantial, a reviewing court's task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence. (*Ibid.*) Rather, the sole relevant question for purposes of substantial evidence review "is whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' " (*Ibid.*)

The unjust killing of a human being is presumed to be murder in the second, rather than first, degree. (*People v. Anderson* (1968) 70 Cal.2d 15, 25.) "First degree murder 'has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty.' [Citation.] These elements require 'more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death.' [Citation.] ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' " (*Gomez, supra*, 6 Cal.5th at p. 282.)

"[E]vidence of planning, motive, and manner of killing is often relevant to this inquiry." (*Gomez, supra*, 6 Cal.5th at p. 282.) However, these categories of evidence "are descriptive and neither normative nor exhaustive, and . . . reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

Here, a review of the record reveals substantial evidence to support the jury's determination that Esqueda sufficiently reflected and acted deliberately when he fatally stabbed Ryan. Esqueda arrived in the Gaslamp Quarter that evening armed with a specialty knife that had a three-inch curved blade. From this one could reasonably infer that he had considered the possibility that a violent encounter would ensue that night. (See, e.g., *People v. Lee* (2011) 51 Cal.4th 620, 636 [defendant's decision to bring a loaded handgun on the night the victim was killed indicated defendant had considered the possibility of a violent encounter]; *People v. Elliott* (2005) 37 Cal.4th 453, 471 [one could reasonably infer from defendant's arming himself with a knife that he planned a violent encounter].) Notably, before Esqueda and Holliday's interaction with Chris, the video evidence showed that Esqueda had unfolded his knife and concealed it, suggesting that he was preparing to use the knife before engaging with Chris.

In addition, the evidence showed that Esqueda and Holliday targeted Chris, who appeared to be alone on the sidewalk. The pair initiated contact with him, with Esqueda brushing past the obviously inebriated Chris and glaring at him, and Holliday staying behind Chris and then punching him in the head. Esqueda and Holliday thus began the entire deadly sequence of events. And then, after Holliday and Esqueda attacked Chris and Chris's friends rushed across the street to his aid, Esqueda began verbally taunting one of the other victims while holding his knife. He threated Andrew, saying, "What's up mother fucker. You want some?" One could infer that he was contemplating deadly action at this point with his menacing words and conduct. Indeed, it is difficult to imagine what else he could have been referring to. And mere moments later, he stabbed not just one but *two*

48

victims. Again, premeditation and deliberation can occur in a brief period of time; there is no requirement of extensive planning. (See *People v. Brady* (2010) 50 Cal.4th 547, 563.)

The manner in which Esqueda attacked Ryan also permitted an inference of premeditation and deliberation. Esqueda used such force that he plunged the knife deep into Ryan's neck, causing the full three-inch blade to enter to its hilt. A jury may infer premeditation from the use of a deadly weapon to target a vital part of the victim's body, such as Esqueda did here. (See, e.g., *People v. Booker* (2011) 51 Cal.4th 141, 152, 173 [infliction of stab and cut wounds to the neck evidenced that the victim was killed deliberately]; *People v. Harris* (2008) 43 Cal.4th 1269, 1287 [among the evidence supporting finding of premeditation was that the defendant stabbed the victim directly in a vital area with significant force]; *People v. Cruz* (1980) 26 Cal.3d 233, 245 [aiming and discharging deadly force at the head and face permitted jury to infer that the defendant "must have killed intentionally according to a preconceived design"].)

In addition, courts may look to evidence of a defendant's conduct after the killing in considering the reasonableness of an inference of premeditation and deliberation. (See *People v. Disa* (2016) 1 Cal.App.5th 654, 667 [jury could "reasonably consider defendant's conduct after the killing in relation to the manner of killing" in assessing premeditation and deliberation]; *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1267 [considering post-murder behavior of the defendant, which showed he was "horrified and distraught," as indicative of lack of premeditation and deliberation].) Here, the evidence showed that far from appearing concerned, remorseful, or fearful, Esqueda instead appeared satisfied after thrusting the knife into Ryan, and he continued to taunt the victims, saying "what's up, what's up" while holding

49

the knife up toward Brandon as he left the scene. While such conduct on its own could not support a finding of premeditation and deliberation, when considered in the context of how the events unfolded and the full scope of Esqueda's conduct that night—from arming himself with the knife, behaving threateningly multiple times, taunting the victims, and then thrusting the knife into Ryan's neck with significant force—this post-stabbing behavior is additional evidence from which one could conclude that Esqueda acted with premeditation and deliberation in killing Ryan.

We conclude that the evidence is sufficient to affirm Esqueda's conviction for first degree murder.

2. *Substantial Evidence Supports Esqueda's Conviction for Attempted Murder*

Esqueda also asserts that there was insufficient evidence to support the jury's guilty verdict on the charge of attempted murder. Specifically, Esqueda argues there was no substantial evidence that he intended to kill Andrew when he stabbed him. Applying the same appellate review standards as those we applied in considering Esqueda's argument regarding the sufficiency of the evidence to support his conviction for first degree murder, we reject this argument as well.

To be guilty of attempted murder, the defendant must have (1) harbored the specific intent to kill and (2) committed a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) There is rarely direct evidence of a defendant's intent to kill. (*Id.* at p. 741.) Rather, intent to kill is often inferred from the defendant's acts and the circumstances of the crime. (See *People v. Lee* (1987) 43 Cal.3d 666, 679; *People v. Lashley* (1991) 1 Cal.App.4th 938, 945–946 ["Absent . . . direct evidence, the intent obviously must be derived from all the

50

circumstances of the attempt, including the [defendant's] actions and words."].)

Along with all of the evidence that supports Esqueda's conviction for Ryan's murder, the evidence also demonstrated that Esqueda stabbed Andrew, an unarmed victim, at least twice in vulnerable parts of his body— his chest and back. Certainly, stabbing a victim more than once is evidence of an intent to kill. (See *Avila, supra,* 46 Cal.4th at pp. 701–702 [repeated attempts to stab unarmed and trapped victim was substantial evidence of intent to kill].) So, too, is stabbing a victim in a vital and vulnerable part of the body. (See *People v. Bolden* (2002) 29 Cal.4th 515, 561 [only possible inference from deep wound to vital area of the body of victim who appeared to have been defenseless and unsuspecting was that defendant had an intent to kill]; *In re M.S.* (2019) 32 Cal.App.5th 1177, 1185 ["Evidence of intent to kill may be satisfied by proof of a single stab wound that penetrates a vital organ."]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [intent to kill could be inferred from evidence that defendant stabbed the victim "in the abdomen, an extremely vulnerable area of the body"].) In this case, Andrew suffered serious and life-threatening injuries to parts of his body that hold vital organs. Again, the jury was entitled to consider *all* of the circumstances of Esqueda's stabbing of Andrew, including Esqueda's decisions and behavior before that stabbing, the location of Andrew's injuries, the nature of the wounds Esqueda inflicted, as well as Esqueda's conduct immediately following the stabbing, as part of its analysis as to Esqueda's guilt on the charge of attempted murder. And it was reasonable for the jury to infer from all of these circumstances that Esqueda acted with the intent to kill when he stabbed Andrew.

We conclude substantial evidence supports the jury's determination that Esqueda was guilty of attempted murder of Andrew.

3.    *There Was No Error in the Giving of CALCRIM No. 521*

Esqueda argues that CALCRIM No. 521, the standard instruction on first degree murder, inaccurately defines premeditation.  We review claims of instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

a.    *Additional Background*

Without objection or request for a modification from defense counsel, the trial court instructed the jury with CALCRIM No. 521 as follows:

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted *willfully* if he intended to kill.  The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.
>
> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.  A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the reflection, not the length of time."

b.    *Analysis*

Esqueda takes issue with the following sentence from CALCRIM No. 521:  "The defendant acted with premeditation if he decided to kill before completing the act that caused death."  He complains that this sentence "inaccurately told the jurors that appellant had premeditated the killing as

52

long as he decided to kill [Ryan] before stabbing him," but that this is "tantamount to merely requiring a finding that the defendant killed intentionally." Esqueda argues that the remainder of the instruction "did not rectify the inaccuracy."[17]

Although we review challenges to jury instructions de novo, when faced with such a challenge, " 'we must consider the instructions as a whole and assume that the jurors are intelligent persons and capable of understanding and correlating *all* jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338, italics added.) Further, "[i]nstructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

Here, CALCRIM No. 521 adequately apprised the jury of the relevant legal principles. The Supreme Court has explained, " 'In the context of first degree murder, " 'premeditated' means 'considered beforehand . . . .' " ' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.) In the context of the instruction given here, there is no meaningful distinction between " ' " 'considered beforehand' " ' " (*ibid.*) and "decided to kill before" (CALCRIM No. 521). This is particularly true given the rest of the instruction, which adequately clarifies that a defendant's mere decision to kill, by itself, is not sufficient to establish premeditation. Rather, it explains that "[a] decision to kill made rashly, impulsively, or without careful consideration is not

17    In framing this contention as a challenge that the instruction is an inaccurate statement of the law, Esqueda avoids the forfeiture that would otherwise generally be found as a result of the failure to seek modification or further elucidation of a point of law in an instruction, as "no forfeiture will be found where . . . the court's instruction was an incorrect statement of the law." (*People v. Mason* (2013) 218 Cal.App.4th 818, 823.)

deliberate and premeditated," and that "[t]he test is the extent of the reflection . . . ." (*Ibid.*) Thus, the instruction expressly provides that an impulsive decision, made without reflection, does not constitute premeditation. Because of this, the instruction specifically requires that the jury find a defendant guilty only if it finds a defendant reflected and considered his actions before killing, and it does not remove the element of reflection required for a finding of first degree murder, as Esqueda contends.

The element of reflection is also embedded in the instruction's directive that a defendant must have acted not only with premeditation, but also must have acted willfully (if "he intended to kill") and deliberately (if "he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill"). The combined requirements that the killing be " ' "willful, deliberate, and premeditated" ' " emphasize that the jury must find defendant acted with " 'substantially more reflection than may be involved in the mere formation of a specific intent to kill.' " (*People v. Arias* (2008) 45 Cal.4th 169, 181.) We therefore conclude that the instruction accurately reflects the law and informed the jury in this case that in order to find Esqueda guilty of first degree murder, it must first find he reflected on his decision to kill by carefully weighing the consequences of his actions in advance.

CALCRIM No. 521's language is distinguishable from the jury instruction considered by the Supreme Court in *People v. Bender* (1945) 27 Cal.2d 164 (*Bender*), a case on which Esqueda relies. In *Bender*, the court found a first degree murder instruction to be erroneous because it "excludes from the required showing any deliberation and premeditation between the intent and the act of killing" and "eliminate[s] any necessity for deliberation or premeditation in forming the intent." (*Id.* at p. 183.) Here, as discussed,

54

CALCRIM No. 521 requires findings of deliberation, premeditation, and willfulness. It also embeds within those requirements the necessity of meaningful reflection. Thus, taken as a whole, CALCRIM No. 521 comports with the legal requirements of premeditated murder, and in providing it, the court fairly instructed the jury on the applicable law.

4. *Even Assuming the Trial Court Erred in Declining to Instruct with CALCRIM No. 510, Esqueda Cannot Demonstrate Prejudice*

Esqueda contends the trial court erred by not giving CALCRIM No. 510, the standard instruction regarding excusable homicide based on accident. At trial, Esqueda's attorney requested this instruction, but the court declined to give it. The record does not reflect the court's reasoning.

In its standard form, CALCRIM No. 510 addresses a killing that results from an accident and provides:

> "The defendant is not guilty of (murder/ [or] manslaughter) if (he/she) killed someone:
>
> "1. By accident and misfortune;
>
> "OR
>
> "1. If the defendant was doing a lawful act in a lawful way;
>
> "2. The defendant was acting with usual and ordinary caution;
>
> "AND
>
> "3. The defendant was acting without an unlawful intent to commit (murder/ [or] manslaughter).
>
> "A person acts with *usual and ordinary caution* if he or she acts in a way that a reasonably careful person would act in the same or similar situation.

"The People have the burden of proving beyond a reasonable doubt that the killing was not excused. If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] manslaughter)."

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40; accord, *Gonzalez, supra*, 5 Cal.5th at p. 199, fn. 3.)

Esqueda argues that even though he "primarily relied on a theory of self-defense, during closing argument [defense] counsel also argued that the stabbing of Harris was accidental." Esqueda acknowledges that in most circumstances, an accident defense is *inconsistent* with self-defense because an accident defense involves an unintentional act while self-defense involves an intentional act. (See *People v. Villanueva* (2008) 169 Cal.App.4th 41, 50–51 (*Villanueva*).) He argues that the normal inconsistency in the two theories was not present in his case, however. Both accident and self-defense may apply "when a defendant accidentally kills while brandishing a weapon in self-defense, if the defendant acted with usual and ordinary caution." (*Id.* at p. 54.) Thus, Esqueda argues, where "a defendant in a murder case 'relies on the theory that the homicide was committed by accident while the defendant was lawfully acting in self-defense without any unlawful intent, the jury should be instructed on excusable homicide.' " (See *ibid.*)

According to Esqueda, the evidence suggesting his stabbing of Ryan was an accident was the compilation surveillance video showed to the jury. He argues that the video shows that when Esqueda and Andrew were fighting, Ryan was standing to the side or behind them. At some point, Ryan moved toward Esqueda. Based on this, Esqueda contends on appeal that "[i]t

56

is certainly possible that appellant stabbed Harris accidentally and did not see Harris in that position prior to stabbing him."

Even if we assume for the sake of argument the court's failure to instruct with CALCRIM No. 510 was error, however, Esqueda cannot demonstrate he suffered prejudice from the absence of this instruction.

Because a theory that a homicide was excusable based on accident is not an affirmative defense, but is, rather, a theory that would negate the intent element of malice, an instruction on excusable homicide based on accident is a pinpoint instruction. (*People v. Gonzalez, supra*, 5 Cal.5th at p. 191, fn. 3; *People v. Anderson* (2011) 51 Cal.4th 989, 997–998.) A trial court's failure to instruct the jury on an appropriate pinpoint instruction on the defense's theory of the case is assessed for harmless error under *Watson, supra*, 46 Cal.2d at page 836. (*People v. Earp* (1999) 20 Cal.4th 826, 886–887; *People v. Sandoval* (2015) 62 Cal.4th 394, 422 ["failure to give a pinpoint instruction . . . is judged as state law error that is prejudicial only where there is a reasonable probability of a more favorable result"].)

The denial of a pinpoint instruction has been held harmless under *Watson* where the instructions that were given did not preclude findings consistent with the proposed pinpoint instruction's theory and where defense counsel fully explained the point to the jury. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.) So, too, has the failure to provide a pinpoint instruction been found to be harmless where, ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' " (*People v. Scully* (2021) 11 Cal.5th 542, 594–595 (*Scully*).) Both scenarios are present here.

First, nothing in the standard instructions precluded the jury from finding that Esqueda lacked the requisite mental state when he stabbed

57

Ryan because he failed to comprehend Ryan's presence and only mistakenly struck him. And, as Esqueda notes, during closing argument defense counsel offered that Ryan was injured as a result of being in the wrong place at the wrong time—i.e., through misfortune or accident. There was thus nothing precluding the jury from accepting this view of the evidence and concluding that Esqueda did not intend to kill Ryan.

Moreover, the jury's verdict necessarily resolved against Esqueda the same factual question that would have been presented by the missing instruction. (See *People v. Wright* (2006) 40 Cal.4th 81, 99.) If the jury had believed that Esqueda did *not* intend to stab Ryan because the stabbing was an accident, it would have rendered a different verdict. The jury did not need a specific instruction on accident to conclude that Esqueda lacked the intent to kill. Moreover, the jury went beyond just finding that Esqueda intended to kill Ryan, finding instead that Esqueda killed Ryan *willfully, deliberately, and with premeditation*. Given this, "it is clear, beyond credible argument, that the jury necessarily rejected the evidence adduced at trial that would have supported a finding to the effect that defendant's 'accident and misfortune' defense . . . was valid." (*People v. Jones* (1991) 234 Cal.App.3d 1303, 1315–1316.) There is thus no reasonable probability the outcome would have been different if the court had instructed the jury with CALCRIM No. 510.

5. *The Court Did Not Commit Reversible Error in Instructing the Jury on Provocation in the Context of Second Degree Murder*

Esqueda argues that jury instructions on the doctrine of provocation were misleading when considered together because they did not explicitly inform the jury that the objective standard applies only for reduction of murder to voluntary manslaughter, but that a subjective standard would permit a reduction from first to second degree murder by eliminating

deliberation, willfulness, and premeditation.  According to Esqueda, the trial court erred in failing to expressly tell the jurors that they should apply a subjective standard to decide if provocation prevented him from sufficiently deliberating and premeditating the killing.

A subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree.  This test inquires as to whether the defendant in fact committed the act because he was provoked, and the rationale for the reduction from first to second degree is that provocation may negate the elements of premeditation, deliberateness, and willfulness that are required for first degree murder.  (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333 (*Hernandez*); see *People v. Jones* (2014) 223 Cal.App.4th 995, 1000.)  But only where an objective test is met may provocation reduce malice murder to voluntary manslaughter.  (*People v. Jones*, at p. 1000.)  For such a reduction to be warranted, the provocation must be so great that it "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."  (CALCRIM No. 570; *People v. Jones*, at pp. 1000–1001.)

Esqueda's jury was instructed with CALCRIM Nos. 520, 521, 522, and 570.  CALCRIM No. 520 generally described the elements of murder and told the jury that if they found the elements of murder true, the murder is of the second degree unless the People have proved beyond a reasonable doubt that it is of the first degree, as defined in CALCRIM No. 521.  In turn, that instruction explained the elements of first degree willful, deliberate, and premeditated murder.  CALCRIM No. 522 then instructed that provocation may reduce murder from the first to the second degree and may reduce murder to manslaughter.  It informed the jury that if it concluded that defendant committed murder "but was provoked," it should "consider the

provocation in deciding whether the crime was first or second degree murder" and should also "consider the provocation in deciding whether the defendant committed murder or manslaughter." CALCRIM No. 570 specifically addressed when murder may be reduced to voluntary manslaughter on the basis of provocation. As given, it provided:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
>
> "The defendant killed someone because of a sudden quarrel or in the heat of passion if:
>
> "1. The defendant was provoked;
>
> "2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;
>
> "AND
>
> "3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.
>
> "Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.
>
> "In order for the heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Esqueda argues that these pattern instructions were likely to have misled the jury into concluding that the objective test applies both for reduction of first to second degree murder, as well as from murder to manslaughter. The courts in *People v. Jones, supra*, 223 Cal.App.4th at pages 999–1001 and *People v. Ocegueda* (2023) 92 Cal.App.5th 548, 557–560 (*Ocegueda*) have rejected this argument. We do as well.

In *People v. Jones*, the jury received the same instructions at issue here—CALCRIM Nos. 520, 521, 522, and 570. (*People v. Jones, supra*, 223 Cal.App.4th at p. 999.) And as Esqueda argues, the defendant in *People v. Jones* argued "that these pattern instructions were likely to have misled the jury into concluding that the objective test applies both for reduction of first to second degree murder as well as from murder to manslaughter." (*Id.* at p. 1001.) In rejecting this argument, the *People v. Jones* court noted that

these instructions "accurately inform[ed] the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed." (*Ibid.*) Rather, CALCRIM Nos. 521 and 522, taken together, informed jurors that any amount of provocation may give rise to an impulsive decision, which would demonstrate the lack of premeditation and deliberation. (*Ibid.*) And the instructions further instructed the jury that a reduction from murder to voluntary manslaughter requires more, in that this reduction requires that the provocation be sufficient to have caused the average person to have acted out of passion rather than judgment. (*Ibid.*) Moreover, the *Jones* court explained, the defendant's argument involved a claim that a pinpoint instruction was necessary to inform the jury that the objective test did not apply to reduce the degree of murder, and the defendant forfeited the argument by failing to raise it in the trial court. (*Ibid.*)

The *Ocegueda* court agreed with *Jones*, also concluding that the standard instructions on provocation are correct and do not improperly imply "that a single standard governed, regardless of the context." (*Ocegueda, supra*, 92 Cal.App.5th at p. 559.) We, in turn, agree with *People v. Jones* and *Ocegueda* and adopt their analysis. Indeed, it would make no sense for the jury to understand the instructions in the manner that Esqueda suggests. The jury could not have erroneously thought that satisfaction of an objective standard of provocation was necessary to reduce first degree murder to second degree, given that it was instructed that satisfaction of the objective standard would necessarily reduce *any* murder—i.e., first *or* second degree murder—to voluntary manslaughter. We also reject Esqueda's contention that his argument is distinct from the one made in *People v. Jones*. He contends that he is asserting that "provocation" has a special meaning in the

62

law and that the court had a sua sponte duty to provide the jury with that definition. But provocation is "not used in a technical sense peculiar to the law," and instead its "common meaning" is to be used by jurors. (*Hernandez, supra*, 183 Cal.App.4th at p. 1334.) Further, the *People v. Jones* court's analysis implicitly rejects the idea that there is a need to provide a special legal definition of provocation for these purposes, in that the opinion concludes that the instructions as crafted accurately reflect the law and do not require more. We agree that these instructions were correct and nothing more was necessary. Thus, to the extent that Esqueda felt that some *additional* elucidation of the meaning of provocation was necessary, his failure to request such an instruction has forfeited such an argument on appeal. (See *People v. Jones, supra*, 223 Cal.App.4th at p. 1001.)

Esqueda attempts to resurrect his forfeited claim by asserting that defense counsel was ineffective for failing to raise this issue in the trial court. To establish ineffective assistance of counsel, a "[d]efendant must show that counsel's performance was both deficient and prejudicial, i.e., that it is reasonably probable that counsel's unprofessional errors affected the outcome." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1014–1015, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687, 693–694.) "[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance." (*Castillo*, at p. 1015.) Obviously, given the correctness of the jury instructions, defense counsel could have reasonably concluded that the instructions, as given, adequately advised the jury and that no further instruction was necessary. (See *id.* at p. 1018 [counsel could reasonably conclude pinpoint instruction relating evidence of

63

intoxication to premeditation was unnecessary because instructions adequately advised jury].)

We therefore reject Esqueda's contention that the jury instructions on the doctrine of provocation were misleading and the failure to clarify them requires reversal of his murder conviction.

6. *Esqueda Has Not Demonstrated He Is Entitled to Reversal Based on Asserted Prosecutorial Error*

Esqueda asserts that the prosecutor committed "numerous instances of misconduct during his closing and rebuttal arguments."[18] Among the prosecutor's asserted transgressions, according to Esqueda, was denigrating the defense "as a sham," implying that the defense had fabricated evidence, misstating the law, and arguing that evidence could be used beyond its admissible purpose.

Prosecutorial error occurs as a matter of state law when a prosecutor "engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict." (*People v. Lightsey* (2012) 54 Cal.4th 668, 718.) "In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict." (*People v. Blacksher* (2011) 52 Cal.4th 769, 828, fn. 35.) Federal constitutional prosecutorial error occurs only when the prosecutor's actions "comprise a pattern of conduct that is serious and egregious, such that the

---

[18] The Supreme Court has explained that " 'the term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.) " 'A more apt description of the transgression is prosecutorial error.' " (*Ibid.*) We will therefore refer to Esqueda's claims regarding the prosecutor's arguments as claims asserting prosecutorial error.

trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law." (*Lightsey*, at p. 718.) Under federal law, relief is not available if "the challenged conduct was . . . harmless beyond a reasonable doubt." (*Blacksher*, at p. 828, fn. 35.)

Ordinarily, a claim of prosecutorial error is preserved for appeal only if the defendant made "a timely and specific objection at trial" *and* requested an admonition. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*); *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 (*Gonzales*) [claim of prosecutorial error forfeited where objection was made and sustained, but no admonition was requested].) " 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial [error] is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' " (*Seumanu*, at p. 1328.) Consistent with that purpose, "[a] court will excuse a defendant's failure to object only if an objection would have been futile," or if an admonition would not have mitigated the harm caused by the misconduct. (*People v. Jackson* (2016) 1 Cal.5th 269, 349.) " '[T]he absence of a request for a curative admonition' " may likewise be excused if " ' "the court immediately overrules an objection to alleged prosecutorial [error and as a result] the defendant has no opportunity to make such a request." ' " (*Seumanu*, at pp. 1328–1329.) "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

"As a general matter, an appellate court reviews a trial court's ruling on prosecutorial [error] for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 242.) However, when a claim of prosecutorial error presents a question of law on undisputed facts, an appellate court reviews the issue de

novo. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860.) In conducting this review, we determine whether there is a reasonable likelihood that the jury would have understood or applied the prosecutor's remarks in an improper or erroneous manner. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.)

>        a.    *Esqueda's Argument that the Prosecutor's Arguments Shifted the Burden of Proof and "Denigrate[ ] the Defense as a Sham" Is Unpersuasive*

Esqueda complains about the following statements made by the prosecutor early in closing argument:

> "We know that they go across the street to Fifth and up to the corner and loiter there. Right? [¶] What are they doing? Why are they there? There's lots of talk about, you know, 'Where you from.' And I would submit to you, [Chris] is not a credible source of any information that night that's not on video. [¶] *But they have to do something; right? They have to come up with a way to explain the unexplainable.*" (Italics added.)

Defense counsel objected, saying, "Defense had no burden to prove anything." The court admonished the jury, "Ladies and gentleman, again, this is argument. Okay? Argument of the lawyers."

A little bit later, the prosecutor then stated:

> "What is his [Esqueda's] intent that night when they're walking back around and begin to encircle that drunk guy in the black hat, who asked him for the smoke a couple minutes earlier? What are they doing?
>
> "*Have the defense explain that to you.* Because there's only one reasonable interpretation of that. They are hunting." (Italics added.)

Multiple pages later in the transcript, the prosecutor stated:

> "I believe that the credible evidence is that [Chris] said something to [Esqueda], probably along the lines of fuck you, like he said 30 other times of the F word during his

66

interview with the detectives. And that he probably was being a drunk a-hole, as he said, in some form. But he's not the provocateur. These guys are hunting. And they have their opportunity that they've been looking for. And we know that; right? That's proved beyond any reasonable doubt based on the video.

"But the idea that 'Where you from' is something that is going to help the defense. Well, if 'Where you from' was said, so was 'This is zetas.'

"*Have the defense explain that* when they're talking to you about 'Where you from.'

"Because you can't have one and ask you to believe that one without the other, which is why it doesn't help the defense. It would actually hurt them." (Italics added.)

Approximately 10 pages later in the transcript, the prosecutor said, "As we talked earlier, this case has nothing to do with 'Where you from,' *but they've got to get up and say something; right*? It's on video? [¶] *Got to try and explain it somehow*. So how are we going to do that? [¶] *Well, let's inject a gang challenge*, which I submit to you again it was not proved with any credible evidence at all." (Italics added.)

According to Esqueda, these portions of the prosecutor's statements—particularly the italicized portions—"erroneously informed the jury that [Esqueda] had some burden of proof or persuasion." He complains that the court not only "fail[ed] to correct this misstatement, it overruled [Esqueda's] objection, thereby implying that [Esqueda] did have such a burden of proof."

We begin by noting that the only objection registered was to the first of these challenged statements. Again, a defendant forfeits an argument of prosecutorial error on appeal not only where no objection was made, but where no curative admonition was requested, even if such objection was

67

made.  (*Seumanu, supra*, 61 Cal.4th at p. 1328; *Gonzales, supra*, 54 Cal.4th at p. 1275.)  Thus, Esqueda has forfeited his challenge to all but the first of the identified statements.

However, even assuming that Esqueda's initial objection to these similar statements rendered further objection futile, we would reach the same result.  It goes without saying that a prosecutor may not misstate the burden of proof.  (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)  But a prosecutor's "[c]omments on the state of the evidence or on the defense's failure to . . . rebut the People's case are generally permissible."  (*People v. Woods* (2006) 146 Cal.App.4th 106, 112.)  Although the prosecutor's statements came unnecessarily close to the line, we conclude it is not reasonably likely that the jury would have understood them as suggesting that the defense actually carried a burden to prove something.  Instead, the comments reflect two types of argument.  First, the prosecutor's rhetorical questions such as "But they have to do something; right?" and similar comments do not reflect a suggestion that the defense actually bore a burden to "do something," but instead suggested that the theory the defense did argue by seizing on the notion that Chris made a gang challenge was not plausible.  The other comments—i.e., those in the vein of "[h]ave the defense explain that"—also could not reasonably be understood as attempting to require the defense to provide any particular explanation.  Instead, such language was a stylistic device intended to point out that the defense had failed to provide a plausible explanation for the evidence.  These comments "were [thus] meant to 'vigorously challenge the validity of [the] defense.' " (*People v. Williams* (2016) 1 Cal.5th 1166, 1188–1189 (*Williams*) [no prosecutorial error where prosecutor argued that the defense has " 'got to scramble to find something else' " because initial defense " 'doesn't work' "].)

68

Esqueda further complains that the argument denigrated the defense and suggested that it had manufactured evidence as an attempt to create doubt as to guilt. We also disagree with this reading of the prosecutor's argument. Again, the prosecutor was vigorously challenging the validity of the defense. The prosecutor was not implying that defense counsel was dishonest, but was arguing that the defense position was untenable based on the evidence. This is fair argument. (See *Williams, supra*, 1 Cal.5th at p. 1189.)

b. ***Esqueda Forfeited His Contention that the Prosecutor Misstated the Law of Self-Defense by Failing to Object at Trial, and He Cannot Establish Ineffective Assistance of Counsel***

Esqueda next contends that the prosecutor misstated the law while discussing the claim of self-defense. Specifically, Esqueda argues that the prosecutor committed error by twice telling the jury that initial aggressors are unable to rely on self-defense without also qualifying those two statements by mentioning an exception to that rule as described in a portion of CALCRIM No. 3471. According to Esqueda, the prosecutor's statements failed to inform the jury that if a defendant "used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop the opponent or given the opponent a change to stop fighting." (CALCRIM No. 3471.)

Defense counsel did not object to either of the now-challenged statements or seek an admonishment regarding the law of self-defense in response to the prosecutor's statements. Thus, any argument challenging

69

these two statements has been forfeited. (See, e.g., *Seumanu, supra,*
61 Cal.4th 1293, 1328.)

Esqueda contends that if this court deems his contention forfeited, then
trial counsel's failure to object and request the jury be admonished
constituted ineffective assistance of counsel. He summarily asserts that
"[t]here simply can be no valid tactical purpose for defense counsel's failure to
[object to improper argument and request curative admonitions]."

We apply the same standards regarding an ineffective assistance of
counsel claim set out in part III.B.6 to this assertion of ineffective assistance.
Thus, Esqueda must demonstrate that trial counsel's performance was
deficient *and* that but for this deficient performance, there is a reasonable
probability the outcome of the proceeding would have been different. (See
*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Neither prong has been
demonstrated here. First, the record is silent as to why defense counsel did
not object to the now complained of statements by the prosecutor, and we
cannot conclude that the record "affirmatively discloses counsel had no
rational tactical purpose" for not objecting. (See *ibid.*) Rather, " '[t]he
decision facing counsel in the midst of trial over whether to object to
comments made by the prosecutor in closing argument is a highly tactical
one . . . ' [citation], and 'a mere failure to object to . . . argument seldom
establishes counsel's incompetence.' " (*People v. Centeno* (2014) 60 Cal.4th
659, 675 (*Centeno*).)

Further, there is no reason to conclude that the result here would have
been different if defense counsel had objected and the court had admonished
the jury regarding the exception to the general rule the prosecutor had
described. The jury received jury instructions that correctly set out the law.
In fact, the court not only verbally instructed the jury with CALCRIM

70

No. 3471, including the portion of it that Esqueda now complains the prosecutor failed to include, but the court provided the jury with a set of written instructions that included that language. There is no reasonable likelihood that the jury would have applied the law as stated by the prosecutor over the instructions provided by the court.

### c. *Esqueda's Argument that the Prosecutor Violated a Court Order Is Unpersuasive*

Finally, Esqueda contends that various of the prosecutor's remarks regarding the evidence and how it combined to demonstrate guilt violated a court order. According to Esqueda, the following remarks tying the Pacific Beach and Chula Vista incidents to the Gaslamp Quarter incident constituted violations of a court order regarding the admissible use of the other crimes evidence:

1. "You know that it's not [Chris's fault]. You know about the April [Pacific Beach/Chula Vista] incidents. You know about these two crime partners. You know about the seven minutes."[19]

2. "The judge has instructed you on the law and how you can consider those April incidents. Well, the two incidents in April, you can consider them with regards to what the defendants' intent are.

   "But you can also consider those April incidents as part of the totality of the evidence in terms of how these guys know each other, how well do they know each other, and what have they done before.

---

[19] The "seven minutes" appears to be a reference to the amount of time Esqueda and Holliday were wandering in the Gaslamp Quarter before they engaged with Chris.

71

"And when we talk about considering all the evidence, CALCRIM 220, this the reasonable doubt instruction. The Court told you to consider all the evidence that was received throughout the trial. . . . Even in the concluding instructions, you know, completely consider all the evidence.

"This is part of this trial. And you get to consider all of the evidence."

3. "An agreement can be inferred from the conduct. And I'm arguing to you that's exactly what you should do. You infer that agreement through that conduct and through the repetitive nature of that conduct. And it can be inferred by that conduct when there's a common purpose to commit a crime.

"Let's talk about that common purpose in terms of, you know, is it coincidence that two weeks later these same two dudes are in that same Chrysler 200 at a mall that's at closing time. Not dissimilar from being in sort of the Gaslamp at closing time. Is that coincidence or is that their common sort of operating procedure? And I would submit to you it's the latter, not the former."

4. "The burden that I have to prove to you is proof beyond a reasonable doubt and we have done that. It's an abiding conviction, a lasting belief. . . . [W]hen somebody asks you . . . , [']What was the trial about?['] Tell them. Tell them about all the evidence. Tell them about the fact that the murder was on video.

"[¶] . . . [¶]

" . . . Tell them about the body-worn camera that you saw. Tell them about all the evidence. Tell them about the April incident. Say, well, how did you know they even knew each other? Well, they committed crimes back in April, eight months earlier, twice, together, two weeks apart, innocent victims."

72

Esqueda's attorney objected *only* to the first of these statements. At no other point did Esqueda's attorney object or request an admonition regarding the use of the other crimes evidence. As a result, Esqueda has forfeited all but the first challenged statement. (See *People v. Powell* (2018) 6 Cal.5th 136, 171 [where defendant objected only a single time to multiple statements by the prosecutor, "the rest of defendant's claims of prosecutorial misconduct have been forfeited"].) Although Esqueda makes a conclusory argument that further objections would have been futile, there is no basis to conclude this is so. There was nothing in the court's overruling of defense counsel's objection to indicate that objections to other arguments would have been futile. (See *ibid.* [court's overruling of single objection did not itself suggest that further objections would be futile].)

As to the sole statement Esqueda did challenge—"You know that it's not [Chris's fault]. You know about the April incidents. You know about these two crime partners. You know about the seven minutes."—Esqueda contends that the prosecutor's argument violated the court's "ruling" regarding the limited use of the evidence regarding each of the incidents. However, Esqueda fails to cite to any part of the record in which the court made such a ruling. Nevertheless, the trial court did agree to modify CALCRIM No. 375 to permit evidence regarding the Pacific Beach and Chula Vista incidents to be used only in connection with establishing the defendants' intent as to those two incidents, and not in connection with the Gaslamp Quarter incident. Thus, to the extent that the prosecutor's argument could have been viewed as permitting the use of the evidence beyond the limited purpose for which the trial court had attempted to instruct the jury it could be used, we presume the prosecutor's argument constituted error.

However, the court's giving of the instruction that provides the basis for Esqueda's argument about the prosecutor's statements itself operated to blunt any prejudice that could have resulted from the asserted prosecutorial error with respect to Esqueda's convictions in counts 1 through 3. Again, Esqueda's jury was informed through the modified version of CALCRIM No. 375 that the evidence going to the Pacific Beach and Chula Vista incidents was only to be used in connection with deciding whether Esqueda had the "*intent to steal* from [the] victims." (Italics added.) Thus, the instruction limited the use of the Pacific Beach and Chula Vista crimes to consideration as to whether the defendants had the intent to steal, and the intent to steal was not relevant to the determinations jurors were asked to make in connection with the Gaslamp Quarter charges. And to the extent there was therefore some tension between the prosecutor's statements and the jury instructions, " 'we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' " (*Centeno, supra*, 60 Cal.4th at p. 676.) Indeed, the jury was also expressly told to follow the court's instructions in the event that something the prosecutor said conflicted with those instructions: "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." As a result, we are unconvinced that the jury's verdicts on counts 1 through 3 were affected to Esqueda's detriment by the prosecutor's challenged statement regarding "the April incidents." (See *People v. Frye* (1998) 18 Cal.4th 894, 976 [applying state law error review to prosecutorial error exposing jurors to improper evidentiary matter],

disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 420–421].)

7.     *There Is No Cumulative Error Warranting Reversal*

Esqueda contends that even if any particular error in his case was individually harmless, the asserted errors cumulatively resulted in an unfair trial, requiring reversal.

" 'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." ' " (*People v. Mireles* (2018) 21 Cal.App.5th 237, 249.)  " 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*Ibid.*)

We have already concluded that Esqueda's convictions on counts 5 through 7 must be reversed.  As to his remaining convictions on counts 1 through 3, we conclude that the few errors or presumed errors that occurred during Esqueda's trial were harmless, whether considered individually or collectively.  A defendant is "entitled to a fair trial but not a perfect one" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009), and, as to counts 1 through 3, Esqueda received a fair trial.  Reversal of his convictions on those counts is not warranted.

IV.

DISPOSITION

Both judgments of conviction are reversed as to counts 5 through 7 only and the defendants' sentences are vacated.  Both cases are remanded to the trial court for further proceedings and resentencing.  In all other respects, the judgments are affirmed.  The People shall have 60 days from the date of the remittitur in which to file an election to retry one or both defendants on the

reversed counts 5 through 7.  Following retrial, or if the People elect not to retry these counts, the trial court shall resentence each defendant accordingly, amend the abstracts of judgment to reflect the resentencing, and send certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.

BUCHANAN, Acting P. J.

WE CONCUR:

KELETY, J.

RUBIN, J.

76